IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

STEPHEN M. VANCE, in his capacity as )
Trustee of the Stephen M. Vance Revocable )
Trust dated October 9, 2017, derivatively )
on behalf of Broce Manufacturing Co., Inc., )
)
       Plaintiff, )
)
vs. )
)
ALAN B. VANCE, TERI V. HUBBELING, )
MICHAEL F. HUBBELING, JULIE B. )
VANCE AND WALDON EQUIPMENT, LLC, )    Civil Action No. _____
)
      Defendants, )
)
     and )
)
BROCE MANUFACTURING CO. INC., )
)
)
      Nominal Defendant. )
_____ )

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

For his causes of action against Defendants Alan B. Vance, Teri V. Hubbeling,

Michael F. Hubbeling, Julie B. Vance and Waldon Equipment, LLC, and Nominal

Defendant Broce Manufacturing Co. Inc., Plaintiff Stephen M. Vance, in his capacity as

Trustee of the Stephen M. Vance Revocable Trust dated October 9, 2017, states as

follows:

### PARTIES

1.     Plaintiff Stephen M. Vance, in his capacity as Trustee of the Stephen M.

Vance Revocable Trust dated October 9, 2017 ("Plaintiff"), is a citizen and resident of

1

Colorado.

2.     Nominal Defendant Broce Manufacturing Co. Inc. ("Broce Manufacturing") is a Kansas corporation that owns and operates a manufacturing facility in Dodge City.  It is joined as a nominal defendant for the purpose of the derivative claims asserted herein.

3.     At all material times, Plaintiff has been a shareholder of Broce Manufacturing.  He brings this action pursuant to Fed. R. Civ. P. 23.1 to enforce rights that Broce Manufacturing has failed to enforce.

4.     Defendant Alan B. Vance ("Alan") is a citizen and resident of Massachusetts.  He is an officer, director and shareholder of Broce Manufacturing.  He has served at all material times as its President and Chief Executive Officer.

5.     Defendant Waldon Equipment, LLC ("Waldon Equipment" or "Alan's company") is an Oklahoma limited liability company that owns and operates a manufacturing facility in Fairview, Oklahoma.  On information and belief it is not authorized to do business in Kansas.  Waldon Equipment is wholly-owned and controlled by Alan.

6.     Defendant Teri V. Hubbeling ("Teri") is a citizen and resident of Texas. She is a director and shareholder of Broce Manufacturing.  She is also a nominal officer, having been appointed Secretary/Treasurer by the Directors.

7.     Defendant Michael F. Hubbeling ("Michael") is a citizen and resident of Texas.  He is a director and shareholder of Broce Manufacturing.  He is Teri's husband.

8.     Defendant Julie B. Vance ("Julie") is a citizen and resident of

Massachusetts.  She is a shareholder of Broce Manufacturing and, since March 26, 2019, a director.[1]  She is Alan's wife.

9.      Stephen M. Vance, Alan B. Vance and Teri Vance Hubbeling are siblings.

## JURISDICTION AND VENUE

10.      The Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332. There is complete diversity among the parties and the amount in controversy exceeds $75,000.00 exclusive of interest and costs.

11.      The Court has jurisdiction over each defendant.  Broce Manufacturing is a Kansas corporation.  The Court has jurisdiction over Waldon Equipment pursuant to K.S.A. 60-308(b)(1)(A), (E), (G) and (L) and/or K.S.A. 60-308(b)(2).  The Court has jurisdiction over Alan, Teri, Michael and Julie (collectively "the Directors") because they are directors of a Kansas corporation doing business in Kansas, and pursuant to K.S.A. 60-308(b)(1)(A), (B), (E) and (L) and/or K.S.A. 60-308(b)(2).  Each defendant has sufficient contacts with this District to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

12.      Venue is proper in this District pursuant to 28 U.S.C. § 1391 because Broce Manufacturing conducts its manufacturing operations from facilities in Kansas, and the Directors and Waldon Equipment have received substantial compensation for activities they have undertaken here, purportedly undertaken here and/or that have been undertaken on their behalf here.

---

[1] Plaintiff is not asserting a damage claim against Julie based on transactions, acts or omissions prior to her recent

## NATURE OF THE ACTION AND DEMANDS MADE

13.     Plaintiff brings this derivative action to remedy the damage to Broce Manufacturing and corporate waste caused by multiple related-party transactions and other acts and omissions for which some or all of the Directors are responsible in breach of their fiduciary duties of loyalty and care.  These acts and omissions have systematically shifted and bled corporate opportunities, intellectual property, good will and other value out of Broce Manufacturing to Alan's company, Waldon Equipment, for inadequate consideration or no consideration.  The Directors have also authorized the payment of sums to Alan and Teri as salary which are greatly in excess of the value of any services they are providing to Broce Manufacturing and, on information and belief, have engaged in wrongful acts in an effort to diminish Plaintiff's ownership interest in Broce Manufacturing.

14.     This action is not a collusive action to confer jurisdiction the Court would otherwise lack.

15.     Plaintiff has attempted on multiple occasions to persuade the Directors to take action to remedy the matters in issue herein, most recently at a shareholders meeting on March 26, 2019.  On that occasion, Plaintiff made 13 motions to require Broce Manufacturing to take specific actions.  These motions are described with particularity at Exhibit 1, attached hereto and incorporated by this reference.

election to the Board of Directors.

16.    The Directors have consistently refused to take the actions Plaintiff has proposed.  The Directors voted against all but one of the motions Plaintiff made at the March 26, 2019 shareholders meeting.  Additional efforts to obtain the relief requested herein voluntarily would be futile.[2]

## FACTS

17.    Broce Manufacturing was established in 1963 by the late-Ray C. Broce, a paving contractor who was the maternal grandfather of Stephen M. Vance, Alan B. Vance and Teri Vance Hubbeling.  For more than 50 years, Broce Manufacturing has produced self-propelled pavement sweepers ("brooms") for use in the road construction and paving industries and in other industrial applications.  Its products are marketed by a network of dealers around the United States and in several foreign countries as "the Broce Broom."

18.    Since 1963, Broce Manufacturing has invested thousands of hours of

---

[2] In general terms, these motions would have required Broce Manufacturing to retain one or more independent consultants to assess the relationship between Broce Manufacturing and Waldon Equipment, and the extent to which Broce Manufacturing has been and will be damaged by the actions and inactions of the Directors in relation to Waldon Equipment; to secure an accounting of the amount of compensation paid to Alan and Teri for their services to Broce Manufacturing and determine a reasonable amount of compensation to be paid to them going forward if they remain employed as officers; to take legal and/or other actions needed to discontinue ongoing advertising and promotional activities which imply that Waldon Equipment is owned by or affiliated with Broce Manufacturing; and take other actions.  The sole motion that was approved was for the Board to retain an independent accounting firm or auditor to inspect the books and records of Waldon pursuant to the Manufacturing Agreement to determine (a) the actual cost and expense incurred by Waldon to engineer, manufacture and ship the BW260, and (b) the actual cost and expense incurred by Waldon to provide engineering and shop labor for the front mounted broom project.  (*See*, *infra*).  Even on this score, Broce Manufacturing's failure to arrange for such an accounting without the need for Plaintiff to file a motion requiring them to do so breached the Directors' fiduciary duty of care.  Even on this score, it appears that the Directors have yet to fulfill their commitment to retain an independent accounting firm or auditor.

employee time and significant out-of-pocket expense in the development of engineering

and technical information and processes used in the production of its products. Its

product designs and innovations, engineering drawings, plans, specifications and tooling,

as well as its production methods, techniques, proprietary processes and the expertise and

know-how of its employees are neither generally known nor readily ascertainable by

proper means by competitors.

19.     As a result of its decades of experience in the pavement sweeper industry,

Broce Manufacturing has amassed extensive business and financial information,

including knowledge regarding suppliers and potential suppliers of component parts,

materials and assemblies used in the production of its products, and the characteristics

and pricing of the goods sold by its suppliers and potential suppliers. It has invested

significant time and money in the development of relationships with its suppliers, its

network of dealers and its customers. It has developed proprietary sales techniques and

strategies, and information regarding the purchasing history of its customers. Moreover,

it has developed a sophisticated understanding of the skills and staffing levels required to

produce self-propelled pavement sweepers most efficiently. This information is neither

generally known nor readily ascertainable by proper means by competitors.

20.     As a result of the investment of its time and money over many decades,

Broce Manufacturing has acquired a reputation in the road construction industry as a

source of high-quality and durable sweeping products. The brand-names "Broce" and

"Broce Broom" are well-known in the industry.

21.    The trade secrets, good will, experience, know-how and other intangible assets and intellectual property owned by Broce Manufacturing represent its most valuable assets.  To allow a potential competitor access to these assets without appropriate protective measures in place would permit the potential competitor to compete for sales without assuming any of the costs and risks associated with the development and marketing of the products Broce Manufacturing sells–which is precisely what has occurred in this case.  What makes this case unusual is that the competitor unfairly profiting from the efforts and  expenditures of Broce Manufacturing–Waldon Equipment--is owned and operated by Broce Manufacturing's President and Chief Executive Officer, Alan B. Vance.

### Alan's and Teri's Association With Broce Manufacturing

22.    Alan was placed on the Broce Manufacturing payroll in 2004 by his parents, A.A. Vance, Jr. and Deloris R. Vance, the son-in-law and daughter of Ray C. Broce, who by that point controlled the business.  He had no prior experience in engineering, manufacturing, sales or the management of a for-profit business enterprise. Notwithstanding his lack of experience, he was named Chief Executive Officer at a salary well in excess of any he had previously been paid.

23.    Alan did not move to Norman, Oklahoma (where Broce Manufacturing had and has a business office) or Dodge City, Kansas (where its manufacturing facility was

and is located) upon being named President and Chief Executive Officer.  Nor did he start

working for Broce Manufacturing on a full-time basis; he has never worked for Broce

Manufacturing on a full-time basis.  Since 2004, he has continued to reside with his

family in Boston, Massachusetts and to devote much of his time to his ongoing work as a

Christian missionary.  His job duties for Broce Manufacturing have been described as

"provid(ing) oversight for all the functions of the company, provid(ing) strategic

leadership and set(ting) the vision for the future growth of the company."

24.     The amount paid to Alan for these part-time services has grown

exponentially since the death of A.A. and Deloris Vance.  He is currently paid

approximately $280,000 per year.

25.     In December, 2008, Deloris R. Vance resigned from her positions as Vice

President and Secretary of Broce Construction and a member of its Board of Directors.

At that point, Teri was elected to fill Mrs. Vance's position as a Director and was placed

on the Broce Manufacturing payroll as Secretary and Treasurer.  She had no prior

experience in bookkeeping, accounting or finance.

26.     Teri did not move to Norman, Oklahoma or Dodge City, Kansas.  Like

Alan, she has never worked for Broce Manufacturing on a full-time basis.  Indeed,

although she has performed occasional ministerial services as a Director, she hasn't truly

worked for the Company on a consistent basis.  She generally divides her time between

her home in Austin and a family-owned ranch near Denver, Colorado.[3]

27.    The amount paid to Teri for such services as she renders to Broce Manufacturing has likewise grown exponentially since the death of A.A. and Deloris Vance.  She is currently paid approximately $125,000 per year.  On information and belief, Alan has approved the payment of a significant and continually increasing salary to Teri to compensate her for activities in relation to the family ranch, which have nothing to do with the operation of Broce Manufacturing.

### *Development of Three-Wheeled Sweepers–the BB250*

28.    The "original broom in the Broce Line of products" is the BB350 Road Construction Sweeper.  (*See*, *e.g.*, https://www.brocebroom.com/broce-bb-350-series-road-construction-sweeper/ ).  The BB350 is a relatively large piece of equipment that has gained broad acceptance in the highway construction and paving industries.  It is a four-wheeled product.  (*Id.*)

29.    Beginning in 1998, in the hope of addressing the needs of a different niche of the self-propelled pavement sweeper market, Broce Manufacturing developed and marketed a smaller and less expensive three-wheeled road sweeper, the BB250 Construction Broom and Sweeper.  (*See*, *e.g.*, https://www.brocebroom.com/broce-bb-250-construction-broom-sweeper/ ).

---

[3] The ranch and Teri's management of the ranch are the subject of separate litigation pending in the District Court of Cleveland County, Oklahoma entitled *Stephen M. Vance, Trustee v. Teri Vance Hubbeling, et al.*, Case No.

30.    The demand for Broce Manufacturing products, including the BB250, grew

over time.  By 2015, according to Alan, the Dodge City manufacturing facility was

unable to produce sweepers rapidly enough to keep up with demand, as a result of which

production lead-times were excessive and, in some cases, sales were lost.

### Alan Acquires Waldon Equipment, LLC

31.    In the meantime, in 2012, Alan bought an 80 percent interest in a struggling

Oklahoma heavy equipment manufacturer, Waldon Equipment, for $200,000.  On

information and belief, Alan borrowed the money used to purchase Waldon Equipment

from the trust established by his mother, the Deloris R. Vance Family Trust.[4]

32.    Waldon Equipment produced heavy-duty loaders and forklifts used in

heavy construction, mining and industrial material handling applications, as well as a line

of backhoes, at a facility in Fairview, Oklahoma, a town of approximately 2,600 located

172 miles from Dodge City.  (*See*, *e.g.*,  https://waldonequipment.com/ ).

33.    Alan initially proposed that Broce Manufacturing should purchase the 80

percent interest in Waldon Equipment.  His proposal was rebuffed by Broce Manufacturing's

then-Board of Directors and shareholders.  It was rebuffed because it appeared to be a bad

investment.  There did not appear to be any significant demand in the marketplace for Waldon

---

[4] It appears that Alan didn't repay this debt until December, 2017.  The acts and omissions of Alan and Teri as controlling successor co-trustees of the trusts established by their parents, the late-A.A. Vance, Jr. and the late-Deloris R. Vance, are the subject of separate litigation pending in the District Court of Cleveland County, Oklahoma entitled *In re Deloris R. Vance Family Trust; Stephen M. Vance v. Teri Vance Hubbeling, et al.*, Case No. CJ 2019-361.

loaders and forklifts, and Broce Manufacturing did not need a partner. At no point did Alan

suggest that Broce Manufacturing should acquire Waldon Equipment in order to increase its

manufacturing capacity.[5]

34. Notwithstanding the rejection of his proposal, Alan has consistently caused both

Waldon and Broce to represent, to the public and to the heavy equipment marketplace that Broce

Manufacturing purchased Waldon Equipment. For example, in 2012, he caused Broce

Manufacturing to issue a press release that states in part as follows:

> **"PARTNERS IN HEAVY DUTY EQUIPMENT AND CONSTRUCTION
> SWEEPERS**
>
> **"**Broce Manufacturing Co (sic) is pleased to announce that as of December 7, 2012, **we
> have joined forces with Waldon Equipment**, LLC to offer additional lines of
> equipment.
>
> "Since 1957, Waldon products have been setting the standard for compact, 4-wheel drive,
> articulated loaders and forklifts, and in 1997 added the 'Digmaster' loader backhoe line.
> Rugged and durable, Waldon products have the reputation of excelling where others fall
> behind or fall apart   .  .  .
>
> "These two companies combined represent over 105 years in heavy equipment
> manufacturing. **The Broce/Waldon team** bring together a shared vision of providing the
> highest quality products and services to enable their customers in their respective
> industries. **This new partnership** highlights our commitment to excellence and will
> enable us to better serve the broad range of needs of our customers   .  .  .  "

(*See*, *e.g.*, Exhibit 2 , attached) (emphasis supplied).

35. The Broce Manufacturing press release is accessible on both the Broce

Manufacturing web-page and the Waldon Equipment web-page. *See*,

https://www.brocebroom.com/broce-manufacturing-joins-forces-with-waldon-equipment/ and

---

[5] Alan has since acquired the remaining 20 percent interest in Waldon Equipment that he didn't buy in 2012.

11

https://waldonequipment.com/waldon-equipment-joins-forces-broce-manufacturing/.

36.     Elsewhere on the Waldon Equipment web-page, in a summary of the history

of the business, the following statement appears:

> "After a 14 year run, Walt and Don decided to retire and sold Waldon to
> Overhead Door in 1982.  It changed hands over the years and was sold to various companies
> before it was purchased by Broce Construction (now Broce Manufacturing).

*See*,  https://waldonequipment.com/about-us/the-waldon-story/ ).

37.     These and other false statements representing that Broce Manufacturing bought

Waldon Equipment, and that Broce and Waldon Equipment have "joined forces," are a "team,"

and are partners in a "partnership" have been made on a continual basis since Alan bought

Waldon Equipment seven years ago.  The press release quoted above, and the statement

regarding the "history" of Waldon were accessible on both the Broce Manufacturing website and

the Waldon Equipment Website as recently as May 12, 2019.   Broce Manufacturing sales

representatives and Alan use a combined logo in their communications and other documents, i.e.,

"BROCE /// WALDON".

38.     By virtue of the favorable reputation Broce Manufacturing has developed in

the marketplace as the result of its investment of time and money over the course of 50 years,

these false statements and misrepresentations boost Waldon's reputation and value at the expense

of Broce Manufacturing, benefitting Alan without any compensation flowing to Broce in return.

### *Migration of Value From Broce Manufacturing to Waldon Equipment–Enter the BW260*

39.     In June, 2014, Alan caused Broce Manufacturing and Waldon Equipment to

enter into a Confidentiality Agreement.  A copy is attached as Exhibit 3.

40.     The Confidentiality Agreement stated that Broce Manufacturing would give

Waldon Equipment access to:

"  .  .  .   Broce Manufacturing Company's proprietary ideas, patentable
ideas, copyrights and/or trade secrets, existing and/or contemplated products and
services, software, schematics, research and development, production, costs, profit and
margin information, finances and financial projections, customers, clients, marketing, and
current or future business plans and models  .  .  .  "

(Exhibit 3, p. 1, ¶ 1).

41.     The Confidentiality Agreement gave Alan's company, Waldon Equipment,

complete and unfettered access to all of Broce Manufacturing's trade secrets and

intellectual property for no consideration.

42.     The Confidentiality Agreement did not give Broce Manufacturing access to

any trade secrets or intellectual property owned by Waldon Equipment.

43.      The Confidentiality Agreement stated that:

"Waldon Equipment shall use the Confidential Information only for the
purpose of evaluating potential business and investment relationships with
Broce Manufacturing Company."

(Ex. __ , p. 1, ¶ 2).

44.     The Confidentiality Agreement also stated that:

"Any use of confidential information exchanged under this agreement or
any activity by any person associated with Waldon Equipment LLC which
can be construed as 'competitive' with Broce Manufacturing Company in
any commercial sense will be considered a breach of this contract."

(Ex. __ , p. 1, ¶ 7).

45.     In 2015, Alan caused Broce Manufacturing to move the work associated

with production of Broce's three-wheeled sweeper, the BB250, to Waldon Equipment's manufacturing facility in Fairview, Oklahoma. The BB250 was produced at the Waldon Equipment facility by Waldon Equipment personnel, with guidance from Broce Manufacturing personnel, for a year. As a result of this arrangement, Waldon Equipment personnel had unrestricted access to the designs, drawings, plans, specifications, tooling, jigs, parts, equipment, procurement information and production methods and know-how developed and used by Broce Manufacturing to produce the BB250. Waldon Equipment personnel thus learned how to produce self-propelled pavement sweepers without risk or expense to its owner.

46.     On information and belief, there was no written agreement between Broce Manufacturing and Waldon Equipment documenting the terms of the arrangements for the production of the BB250 by Waldon Equipment. At no point did Broce Manufacturing formally engage Waldon Equipment to provide product design services.

47.     Broce Manufacturing did not sell as many BB250 sweepers as it hoped because competing three-wheeled road brooms were priced below the price of the BB250. According to Alan, there was no way to reduce the cost of producing the BB250 by an amount sufficient to permit more competitive pricing.

48.     After Waldon Equipment's engineers and manufacturing personnel became thoroughly familiar and experienced in working with Broce Manufacturing's designs, drawings, plans, specifications, production methods and other trade secrets associated

with the BB250, Alan instructed Waldon personnel to design a three-wheeled road

sweeper that could be offered for sale at a price below that of the BB250.

49.     The sole reason to design a three-wheeled road sweeper that could be

produced at a lower cost would be to compete for sales in the same niche of the market

occupied by the BB250.  The development of such a product represented a "use of

confidential information exchanged under (the Confidentiality Agreement)  .  .  .  by  .

.  .  person(s) associated with Waldon Equipment LLC which (could) be construed as

'competitive' with Broce Manufacturing Company in (a) commercial sense."  Thus, Alan

caused Waldon Equipment to breach its Confidentiality Agreement with Broce

Manufacturing.  No action has ever been taken by Broce Manufacturing to enforce its

rights under the Confidentiality Agreement based on the actions Alan caused the

company to take.

50.     Relying on the confidential information and trade secrets developed by

Broce Manufacturing and its experience in producing the BB250, Waldon Equipment

personnel  designed and eventually produced a three-wheeled sweeper that it dubbed the

BW260.

51.     Alan caused Broce Manufacturing to buy BW260s manufactured by

Waldon Equipment.  The payment arrangements between Waldon Equipment and Broce

Manufacturing required Broce to pay Waldon in full for each BW260 within 30 days of

delivery.  It is unknown if the price Broce Manufacturing has paid and continues to pay

for the BW260 is reasonable.  The price was identified by the former minority owner of Waldon and blessed by Broce Manufacturing employees whose continued employment depends on maintaining a successful relationship with Alan.

52.     The BW260s Waldon Equipment sold to Broce Manufacturing were then resold to customers by dealers of Broce products.  Waldon has never incurred the cost of establishing and maintaining a dealer network.  It has never paid a dealer a commission for selling a BW260 to a customer.  These burdens remain with Broce Manufacturing which, consistent with the payment terms customary in its industry, may be forced to wait as long as six months to be paid for a unit sold.  The margin between what Broce Manufacturing pays Waldon Equipment for a BW260 and the amount a customer ultimately pays Broce for it, reduced by the amount of the commission Broce is required to pay a dealer, is so thin as to produce little to no profit for Broce.  The damage to Broce Manufacturing caused by the payment arrangements agreed to by its Directors is even more pronounced in relation to Broce Manufacturing's sale of a large number of BW260s to Ahern Rentals.  The Ahern contract has resulted in an increase in the amount that Broce Manufacturing pays Waldon Equipment for BW260s without any increase in the amount that the ultimate buyer, in this case Ahern, pays Broce Manufacturing.

53.     It is unknown what steps, if any, Broce Manufacturing took to assess the possible enlargement or improvement of Broce Manufacturing's production capabilities prior to exporting production work to Alan's company, Waldon Equipment.

54.     It is unknown what steps, if any, Broce Manufacturing took to design and develop a less expensive three-wheeled sweeper before Alan, with Teri's support, gratuitously passed this opportunity along to Waldon Equipment.[6]  On information and belief, Broce Manufacturing's personnel at the time was not qualified or equipped to evaluate this issue.[7]

### *Ownership of the BW260 and the Manufacturing Agreement*

55.     Alan has consistently claimed that Waldon Equipment owned all rights associated with the design and production of the BW260.

56.     Plaintiff informed Alan that his activities in relation to the BW260 breached his fiduciary duties as an officer and director of Broce Manufacturing.  He demanded that Broce Manufacturing take appropriate steps to document and formalize the relationship between Broce Manufacturing and Waldon Equipment.

57.     In response, the Directors caused Broce Manufacturing to enter into a written Manufacturing Agreement with Waldon Equipment dated September 28, 2018. The Manufacturing Agreement provides *inter alia* that Broce Manufacturing owns all rights associated with the BW260.

---

[6] These events took place prior to Michael's election to the Board of Directors in August, 2018.

[7] In this regard, the fact that Broce Manufacturing personnel allegedly told Alan that "nothing could be done" to produce the BB250 at less cost, if true, is irrelevant.  According to the Directors, "during the year that the Waldon plant produced the BB250, the Waldon engineering team observed that they could make changes to the BB250 that would not significantly compromise the quality of the machine but would reduce the cost of that machine." (Action,

58.     Alan permitted Waldon Equipment to enter into the Manufacturing Agreement only after Alan demanded that Broce Manufacturing pay Waldon $500,000 for the "design" and other "rights: associated with the BW260.  In response to this demand, Teri and Michael ultimately approved a payment from Broce Manufacturing to Waldon Equipment of $460,000 for these alleged "rights."

59.     Alan appears to have abstained from the vote of the Broce Manufacturing directors in favor of paying Waldon Equipment $460,000.  He presumably knew that he was subject to conflicting interests in relation to the decision.  He also knew or should have known that decision to arrange for Waldon Equipment to develop and produce the BW260 decimated the market for the BB250, to the detriment of Broce Manufacturing shareholders.  He presumably assumed that Teri and Michael, the remaining directors at that time, would be viewed as "disinterested" directors in relation to the transaction and could approve a payment of the character he demanded. Teri and Michael did in fact vote in favor of Broce Manufacturing's payment of $460,000 to Waldon Equipment.  On information and belief, Teri and Michael approved the payment of $460,000 to Waldon without adequate or appropriate advice as to whether any sum should be paid to Waldon at all, and without the information or experience required to determine a reasonable purchase price.  They did not know what costs if any Waldon incurred in developing the

September 5, 2018, ¶ 9.  Instead of implementing these changes, Alan's company produced, the BW260, a product that competes with the BB250 and, indeed, has decimated the market for the BB250.

design of the BW260, in developing tooling, or in other categories of expense.

60.     On information and belief, Teri and Michael were not disinterested directors when they voted to approve the payment to Waldon Equipment. Both stood to benefit in a manner not shared by all shareholders of Broce Manufacturing from the Board's decision, based on their unity of interest with Alan in maintaining control of Broce Manufacturing. On information and belief, Teri and Michael voted to support Alan in this manner to assure that he would continue to support Broce Manufacturing's payment of Teri's $125,000 salary, as well as his support of Teri's position in the litigation involving the Colorado ranch property. (*See*, ¶ 26, *infra*, n. 3).

### *Development of a Front-Mounted Broom*

61.     Alan's efforts to shift opportunities and value from Broce Manufacturing to Waldon Equipment have continued. He has caused Broce to engage Waldon Equipment to undertake the development of a new product line for Broce Manufacturing, a front-mounted broom.

62.     Broce Manufacturing identified a front-mounted sweeper as a potential new product line several years ago but, under Alan's leadership, has made no effort to develop such a product.

63.     Alan's company, Waldon Equipment, has billed Broce Manufacturing in excess of $473,000 for its work on the development of a front-mounted sweeper to date. Almost $300,000 of this sum represents engineering charges.

64.     The Directors have made no effort to enlarge or replace the engineering staff of Broce Manufacturing or to evaluate its productivity.  On information and belief, they have not directed the existing Broce Manufacturing engineering staff to undertake any new-product research and development activity of its own, whether in relation to the development of a front-mounted sweeper or otherwise.

65.     Since Alan's acquisition of Waldon Equipment in 2012, its work-force has increased by 184 percent.  The work-force of Broce Manufacturing has increased by ten percent over the same period.  According to its web-page, Waldon Equipment is hiring additional "assemblers" at this time.  (*See*, https://waldonequipment.com/employment/ ).  On information and belief, these individuals will be engaged in the assembly of sweepers and not loaders, forklifts or backhoes.

### Mismanagement of Debt Obligation and Failure To Adopt Adequate Measures For Financial Accounting

66.     On or about June 30, 2016, Broce Manufacturing executed a promissory note as maker in favor of the co-trustees of the Deloris R. Vance Family Trust dated May 12, 1999, as amended on September 10, 2008 ("the Deloris R. Vance Family Trust"), as lender, in the principal amount of $3,370,087.00 plus interest at the rate of 1.41% *per annum* ("the Stock Note").  The Stock Note refinanced a prior promissory note given to finance the redemption of a significant quantity of Broce Manufacturing stock.  Per the terms of the Stock Note, Broce Manufacturing was to make annual payments of accrued interest on each anniversary of the Stock Note for nine years.  Any payment received

more than five (5) days after the due date was assessed a late payment charge equal to 5%

of the delinquent payment.  Moreover, the failure by Broce Manufacturing to make any

payment when due constituted a default, causing the entire outstanding principal balance

amount to immediately become due at the option of the lender, with interest due from the

date of acceleration on the entire outstanding principal balance at the rate of 18%.

67.     The first interest payment due on the Stock Note was due on June 30, 2017.

On information and belief, it was not paid timely, exposing Broce Manufacturing to a late

payment charge equal to 5% of the first interest payment, and likewise exposing Broce

Manufacturing to a claim for immediate payment of the entire principal amount due, plus

interest at the rate of 18%.  On information and belief, the sole reason such a claim has

yet to be asserted is that Alan and Teri, as the controlling successor co-trustees of the

Deloris R. Vance Family Trust, have conspired to administer the trust in a manner that

solely furthers their individual interests, in violation of their fiduciary duties as successor

co-trustees to the other beneficiaries of the Deloris R. Vance Family Trust.[8]

68.     In addition, or in the alternative, the failure of the Defendants to make

arrangements to provide Broce Manufacturing with competent financial accounting

services caused or contributed to the failure to make timely payment on the Stock Note.

The Directors have failed to address this shortcoming over a period of years,

---

[8] The acts and omission of Alan and Teri as controlling successor co-trustees of the trusts established by their parents are the subject of separate litigation pending in the District Court of Cleveland County, Oklahoma. *See*, note 4, *supra*.

notwithstanding Plaintiff's repeated demand for the procurement of such services.

### *Oppressive Action With Respect To Shareholder Distributions*

69.    Plaintiff is a minority shareholder of Broce Manufacturing.

70.    In retaliation for the actions Plaintiff has taken to challenge their mismanagement of Broce Manufacturing and breaches of fiduciary duties, Alan, Teri and Michael, the Directors as of December 18, 2018, acted on that date to cause Broce Manufacturing to reduce or skip the payment of distributions to shareholders, including Plaintiff.

71.    There is no valid business justification for the decision to discontinue the payment of distributions to Broce Manufacturing shareholders.  The Defendants have taken this action solely in an effort to muzzle and freeze out Plaintiff because he has challenged the activities of the Defendants. This constitutes a breach of their fiduciary duty to as directors and majority shareholders.

72.    Plaintiff has been damaged as a result of this oppressive action.

### *Fraud In The Issuance of Stock*

73.    In 2008, Alan, Teri, Plaintiff and their mother, the late- Deloris Vance, entered into discussions regarding the transfer of Broce Manufacturing from Mrs. Vance and her trust to Alan, Teri and Plaintiff.  At that time, there were 10,000 shares of Broce Manufacturing stock outstanding.  Mrs. Vance's Trust owed 8617 shares; Alan, Teri and Plaintiff each owned 311 shares; and each of Mrs. Vance's grandchildren and the spouses

of her children owned 45 shares.

74.     It was initially agreed that Broce Manufacturing would redeem the shares owned by Mrs. Vance's Trust and her grandchildren, leaving the share totals for her adult children and their spouses unchanged. This would leave Alan and Julie with a 34.8% interest in Broce Manufacturing, Teri and Michael Hubelling with a 34.8% percent interest, and Plaintiff (who was not married) with a 30.4% interest.  It was thereafter determined that Mrs. Vance's husband, A.A. Vance, Jr., should retain a modest percentage of Broce Manufacturing stock for tax planning purposes, and arrangements were made for Mr. Vance to retain 0.27% of the shares.

75.     On or about December 15, 2009, approximately 12 months after the stock redemption, Teri gave Plaintiff a summary, which she represented was taken from the Broce Manufacturing stock book or minute book, showing the respective percentages of interest in the company owned by the various parties.  It stated that Alan and Julie owed 34.798% of the stock (Alan's 311.38 shares plus Julie's 45 shares); Teri and Michael owned 34.798% of the stock (Teri's 311.38 shares plus Michael's 45 shares); and Plaintiff owned 30.396% of the stock (311.38 shares).

76.     On information and belief, the financial records of Broce Manufacturing in fact reflected at that point that Alan and Julie owed 35 percent of the issued and outstanding stock; Teri and Michael owed 35 percent of the issued and outstanding stock; Plaintiff owned 29% percent of the issued and outstanding stock; and A.A. Vance, Jr.

owned 1% of the outstanding stock.

77.     When he became aware of this discrepancy, Plaintiff asked Teri, who was

by then a director and the Secretary/Treasurer of Broce Manufacturing, on July 24, 2018,

for an explanation.  In response, Teri provided Plaintiff with the same summary of the

respective stock holdings she furnished Plaintiff in 2009, again claiming that it came

from the stock book or minute book of Broce Manufacturing, and again representing that

Plaintiff owned 30.396% of the stock of Broce Manufacturing.

78.     A month later, however, on August 20, 2018, Teri provided Plaintiff with

a revised summary of ownership interests that differed from the summary provided in

2009 and in July, 2018.  The summary was printed in the same font, and Teri again

represented that it came from the Broce Manufacturing minute book.  Unlike its

predecessor, however, this summary showed that Alan and Julie owned 35.395% of the

Broce Manufacturing stock (Alan 338.35 shares and Julie 71.97 shares); Teri and

Michael owned 35.395% of Broce Manufacturing stock (Teri 338.35 shares and Michael

71.97 shares); and that Plaintiff owned 29.187% percent of the Broce Manufacturing

stock (338.35 shares).

79.     On information and belief, Alan and Teri conspired to defraud Plaintiff by

causing Broce Manufacturing on an occasion or occasions unknown to transfer more

stock to their spouses than was contemplated and agreed to by the parties when the

decision was made to redeem the stock owned by their Mother's trust, and falsely

representing to Plaintiff that he owned 1.209% more of the issued and outstanding stock of Broce Manufacturing than he actually owned.

80.     The amount Plaintiff has received in distributions from Broce Manufacturing since the stock redemption is more than $900,000 below the amount that Plaintiff should have received based on the percentages of ownership interest agreed to by the parties at the time of the stock redemption.

## COUNT ONE–Breach of the Duty of Loyalty

81.     For purposes of this and all ensuing counts, Plaintiff incorporates by this reference the statements and allegations hereinbefore set forth.

82.     The law of Kansas imposes a strict fiduciary duty of loyalty on the officers and directors of corporations that is said to be more exacting than similar laws in other states. *See*, *e.g.*, *Becker v. Knoll*, 291 Kan. 204, 239 P.3d 830 (2010).  The best interests of the corporation and its shareholders must take precedence over the self-interest of officers and directors that is not shared by shareholders generally.  Officers and directors may not convert corporate opportunities to their personal financial advantage at the expense of the corporation.  At all material times, Alan, Teri and Michael, and eventually Julie, were subject to these duties and obligations.

83.     Alan, Teri and Michael breached their duty of loyalty to Broce Manufacturing and its shareholders by causing or permitting it to share its confidential information, trade secrets and other intellectual property with Alan's personally-owned

25

business, Waldon Equipment, for no compensation and without implementing adequate measures to preserve and protect the value of Broce's property; by causing or permitting Waldon to convert corporate opportunities that should have benefitted Broce Manufacturing, including the work associated with the design of the BW260 and the front-mounted sweeper; by causing or permitting Broce Manufacturing to buy BW260s from Waldon Equipment on terms excessively favorable to Waldon Equipment and unfavorable to Broce Manufacturing; by approving the payment of excessive and unreasonable salaries to Alan and Teri; and in other particulars.

84.     As a direct and proximate result of Alan, Teri and Michael's breach of the duty of loyalty, Broce Manufacturing has suffered significant financial damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).  Unless Defendants are enjoined from causing Broce Manufacturing to enter into further self-dealing transactions with Waldon Equipment, these damages will continue, and Broce Manufacturing will suffer irreparable injury and damage for which there is no adequate and complete remedy at law as a result.  Broce Manufacturing is also entitled to an award of punitive damages against Defendants for their breach of fiduciary duties.

<strong>COUNT TWO–Unjust Enrichment</strong>

85.     The transactions between Broce Manufacturing and Waldon Equipment have resulted in the migration of corporate opportunities and other financial benefits from Broce to Waldon.  The transactions were self-dealing transactions directly or indirectly

induced by Alan taking advantage of his fiduciary relationship with Broce.

86.     Waldon Equipment and Alan (Waldon's sole owner) have been unjustly enriched at the expense of Broce Manufacturing by the self-dealing transactions between the two companies.

87.     Waldon Equipment has likewise been unjustly enriched as a result of being permitted to assert the false claim that it was acquired by or is a partner of Broce Manufacturing.

88.     Alan and Teri have been unjustly enriched by the excessive salaries they have been paid by Broce Manufacturing.

89.     Alan, Teri, Michael and Julie have been unjustly enriched as a result of the false and deceptive acts undertaken in relation to the issuance of Broce Manufacturing stock.

90.     The defendants have been unjustly enriched in an amount in excess of Seventy-Five Thousand Dollars ($75,00.00) as a result of the acts and omissions described herein.

### COUNT THREE–Breach of the Duty of Care Against the Directors

91.     The Directors owe Broce Manufacturing and its shareholders a strict fiduciary duty of care that requires the Directors to act with at least that degree of care that an ordinary prudent person in a similar position would exercise under similar circumstances.  At all material times, Alan, Teri and Michael owed the corporation and

its shareholders this duty.

92.     The Directors have breached their duty of care in relation to Broce Manufacturing by squandering the corporate opportunities that have flowed to Waldon Equipment for no consideration or inadequate consideration; by failing to implement adequate measures to preserve the value of Broce Manufacturing's trade secrets, intellectual property and other assets (by potentially exposing the assets of Broce Manufacturing to the claims of Waldon Equipment's creditors pursuant to the doctrine of substantive consolidation); by failing to police and enforce the inadequate confidentiality agreement; by failing to take other measures to prevent Waldon Equipment from developing into a full-fledged competitor in the road-broom market; by failing to adequately evaluate the possibilities for increasing the production capacity of Broce Manufacturing or the enlargement or improvement of its design team; by allowing Broce Manufacturing to promote Alan's business, Waldon Equipment, in advertising and promotional materials; by failing to negotiate fair financial terms in relation to the purchase of BW260s from Waldon Equipment of a character more typical of arms-length transactions in this setting; by failing to implement reasonable accounting procedures necessary to assess the performance of Broce Manufacturing and manage the business appropriately; by failing to make timely payment on the Stock Note and otherwise mismanaging the administration and servicing of Broce Manufacturing's debt obligations; and in other particulars.

93.     As a direct and proximate result of the Directors' breach of their duty of care, Broce Manufacturing and its shareholders have suffered damages in an amount in excess of Seventy-five Thousand Dollars ($75,000.00).  Unless they are required by mandatory injunction to prevent Broce Manufacturing from entering into additional self-dealing transactions with Waldon Equipment, and from advertising an alleged association between Broce Manufacturing and Waldon Equipment that does not exist, these damages will continue, and Broce Manufacturing will suffer irreparable injury for which there is no adequate remedy at law as a result.  Broce Manufacturing is entitled to an award of punitive damages from Alan, Teri and Michael for their breach of fiduciary duties.

### COUNT FOUR–Corporate Waste Against the Directors

94.     The series of transactions with Waldon Equipment that were approved by the Directors of Broce Manufacturing discussed herein, as well as their approval of the payment of excessive and unreasonable officer salaries, served no reasonable or justifiable business purpose, moved value from Broce to Waldon and/or Alan and Teri individually for no consideration, and constituted waste.

95.     As a direct and proximate result of the acts and omissions of the Directors that constituted corporate waste, the value of Broce Manufacturing to its shareholders has been diminished and Alan's company, Waldon Equipment, has experienced a significant corresponding increase in value.  Plaintiff, as a shareholder and derivative representative of Broce Manufacturing, is entitled to a judgment in an amount in excess of Seventy-five

Thousand Dollars ($75,000.00) against Alan, Teri and Michael to compensate Broce

Manufacturing for the decline in the corporation's value attributable to these acts of

corporate waste.

**COUNT FIVE–Conspiracy, Aiding and Abetting, Oppressive Concerted Action**

96.     While Alan does not own and have the power to vote a majority of the

outstanding stock of Broce Manufacturing, he is nevertheless a controlling shareholder,

as he has at all material times exercised a controlling influence over the management and

policies of Broce Manufacturing corporation and the transactions and conduct in issue.

97.     While the Directors have attempted to create after-the-fact minutes of

Board meetings in an attempt to show what they contend was disinterested approval of

certain aspects of Alan's self-dealing with Waldon Equipment, Teri and Michael are not

disinterested.  Alan has purchased Teri and Michael's acquiescence in his control and

management of the affairs of Broce Manufacturing by agreeing to pay Teri a salary which

far exceeds the fair value of the services she renders as the corporation's Secretary and

Treasurer, and by allowing her to control the family ranch.  (*See*, *e.g.*, ¶ 23, note 3, *infra*).

Alan dominates and controls the other Directors, and to the extent the other Directors

have been provided all of the material facts concerning Alan's self-dealing, they have not

in good faith approved such conduct and transactions.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff prays for an order and judgment for monetary damages and injunctive relief in favor of Broce Manufacturing and its shareholders and against the Defendants as follows:

a.      a judgment for money damages in favor of Broce Manufacturing and against Alan B. Vance, Teri V. Hubbeling, Michael F. Hubbeling and Waldon Equipment, LLC, and each of them, for an amount in excess of Seventy-five Thousand Dollars ($75,000) for breach of fiduciary duties, waste and unjust enrichment;

b.      a money judgment in favor of Broce Manufacturing and against Alan B. Vance, Michael F. Hubbeling and Teri V. Hubbeling for punitive damages in an amount to be determined by the Court;

c.      an injunction compelling the Directors to provide Waldon Equipment with the 90-day notice of termination provided for in the Manufacturing Agreement and to refrain from causing Broce Manufacturing to enter into additional transactions with Waldon Equipment, as well as an injunction compelling Waldon Equipment to abide by terms of its covenant not to compete;

d.      an injunction prohibiting the Directors from permitting Broce Manufacturing to represent to the public that Waldon Equipment is owned by or a partner of Broce Manufacturing;

e.      an injunction compelling Waldon Equipment, LLC to cease and desist representing that it is owned by or a partner of Broce Manufacturing;

f.      an injunction requiring the individual defendants to convey to Plaintiff a sufficient number of the shares of stock in Broce Manufacturing to bring Plaintiff's ownership interest to 30.396% of the issued and outstanding shares in the company, prior to the distribution of an additional .09% of the shares to Plaintiff from the Estate of A.A. Vance, Jr.

g.      Plaintiff's costs and expenses incurred in this derivative lawsuit, including reasonable attorney fees; and

h.      such other and further relief in law or equity to which Plaintiff is entitled

31

Charles E. Geister, III, Reg. No.
HARTZOG CONGER CASON
201 Robert S. Kerr Ave., Suite 1600
Oklahoma City, OK 73102
Telephone: (405) 235-7000
E-mail: cgeister@hartzoglaw.com
***Pro Hac Vice Admission to Be Requested***

and

Charles E. Millsap, Reg. No. 9692
William P. Tretbar, Reg. No. 10473
John R. Gerdes, Reg. No. 14358
FLEESON, GOOING, COULSON & KITCH, L.L.C.
P.O. Box 997
Wichita, KS 67201
Telephone: (316) 267-7361
E-mail: wtretbar@fleeson.com
Attorneys for Plaintiff

## DESIGNATION OF PLACE OF TRIAL

Plaintiff respectfully requests that the trial of this matter be held in Wichita, Kansas.

Charles E. Millsap, Reg. No. 9692
William P. Tretbar, Reg. No. 10473
John R. Gerdes, Reg. No. 14358
FLEESON, GOOING, COULSON & KITCH, L.L.C.
P.O. Box 997
Wichita, KS 67201
Telephone: (316) 267-7361
E-mail: wtretbar@fleeson.com
Attorneys for Plaintiff

32

_____

STEPHEN M. VANCE, in his capacity as
Trustee of the Stephen M. Vance Revocable
Trust dated October 9, 2017


**VERIFICATION**

STATE OF COLORADO      )
                            ) ss:
COUNTY OF __Pitkin__     )

       I, Steven M. Vance, as Trustee of the Stephen M. Vance Revocable Trust dated October 9, 2017, state that I have read the foregoing Verified Shareholder Derivative Company that it is true and correct according to my knowledge, information and belief.

_____

STEPHEN M. VANCE, in his capacity as
Trustee of the Stephen M. Vance Revocable
Trust dated October 9, 2017


       SUBSCRIBED TO AND SWORN TO before me, the undersigned authority, on the
18th day of __May__, 2019.    _____
                                  Notary Public

My appointment expires:

PAULETTE S. DANGLER
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID #19984005266
My Commission Expires April 13, 2022