## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| STEPHEN M. VANCE, in his capacity as Trustee of the Stephen M. Vance Revocable Trust dated October 9, 2017, derivatively on behalf of Broce Manufacturing, Inc., | |
| *Plaintiff,* | |
| vs. | Case No. 19-CV-1136-EFM |
| ALAN B. VANCE, TERI V. HUBBELING, MICHAEL F. HUBBELING, JULIE B. VANCE, and WALDON EQUIPMENT, LLC, | |
| *Defendants*, | |
| and | |
| BROCE MANUFACTURING CO. INC., | |
| *Nominal Defendant*. | |

## MEMORANDUM AND ORDER

Plaintiff Stephen Vance ("Steve") brings this action as a shareholder's derivative action on behalf of Broce Manufacturing Co., Inc. ("Broce") and on his own behalf.  Steve asserts claims of breach of fiduciary duty, unjust enrichment, and corporate waste against the following Broce directors:  Alan Vance ("Alan"), Teri Hubbeling ("Teri"), Michael Hubbeling ("Mike"), and Julie Vance ("Julie") (collectively, "Director Defendants").  He also asserts an unjust enrichment claim against Waldon Equipment, LLC, a company owned by Alan and Julie that did business with

Broce.  This matter comes before the Court on two motions:  Director Defendants' Motion for Summary Judgment (Doc. 193) and Waldon's Motion for Summary Judgment (Doc. 196).  For the reasons stated in more detail below, the Court grants in part and denies in part both motions.

**I.      Factual and Procedural Background**[1]

**A.      The Vance Family and Broce Background**

Broce is a leading manufacturer of self-propelled construction sweepers used in highway construction and other light industrial applications. This case centers around Broce's BB250 and BW260 sweepers.  These are three-wheel sweepers that compete with LayMor's three-wheel sweeper.

Broce is a close corporation that is owned and operated by the Vance family.  Steve, Alan, and Teri are siblings who each own approximately 30 percent of Broce's shares.  Alan's wife, Julie, and Teri's husband, Mike, split the remaining shares equally.  Steve, Alan, and Teri are the children of A.A. "Bud" Vance and Deloris Vance, who are now deceased.

From 2007 to December 2017, the Broce board consisted of Bud, Alan, and Teri.  After Bud passed in December 2017, Mike took his place.  In February 2019, Julie joined the board. Steve has never served as a director although Alan and Teri have offered him a seat on the board every year.  Instead, Steve was employed as a "strategic advisor" to Broce, where he participated in monthly meetings and phone conferences with Alan and Teri to discuss Broce's business.

Before 2004, the Vance family's largest asset was Broce Construction, Inc.  Steve served as President of Broce Construction until his resignation in 2006 or 2007.  Steve and Bud often

---

[1] In accordance with summary judgment procedure, the Court has set forth the uncontroverted facts, unless noted otherwise, and they are related in the light most favorable to the non-moving party.

disagreed as to how Broce Construction should operate, which strained their familial relationship. In 2004, Broce Construction was not doing well financially, so the Vance family consolidated the family business into the current company, Broce Manufacturing Co., Inc.  Alan became, and currently still is, Broce's CEO.

In 2007, Teri became Broce's secretary.  Her duties as secretary include giving big-picture advice to Alan, leading the merger of Broce Construction with Broce, leading a stock redemption, and serving as the corporate representative for insurance meetings.  Bud and Deloris set Teri's salary in 2007, and she has only received cost-of-living increases since that time.

In addition to Broce, Steve, Alan, and Teri own a ranch property in Colorado.  Teri is a director of the corporation that owns the ranch and actively manages it.

## B.    Broce Stock Ownership

In 2008, in conjunction with some estate planning, Broce redeemed Deloris's and other family members' Broce stock.  Although it is not clear from the parties' recitation of the facts, at some point in time near the redemption, Director Defendants each received additional shares of Broce stock.  In January 2009, Deloris's attorney prepared a stock schedule that showed the following ownership amounts:  (1) Alan, Teri, and Steve, each with 311.38 shares; (2) Mike and Julie, each with 45 shares; and (3) Bud, with .27 shares.[2]  In February 2009, Deloris's attorney updated the stock schedule, which showed: (1) Alan, Teri, and Steve, each with 338.35 shares; (2) Mike and Julie, each with 71.97 shares; and (3) Bud, with .27 shares.  The updated schedule gave Steve and Director Defendants a larger number of shares than the January 2009 schedule but

---

[2] The Court lists the share amounts as set forth by the parties in their briefs.  They do not explain how or why the total number of Broce shares listed is not a whole number.

resulted in Alan, Teri, and Steve each owning a slightly lower percentage of Broce's stock. Director Defendants contend that the February 2009 Schedule shows the correct stock ownership amounts after the redemption, while Steve contends that the January 2009 Schedule shows the correct stock ownership amounts. According to Steve, the February 2009 schedule was the result of an undisclosed gift of shares from Deloris. Steve claims this "gift" was instituted by Teri.

After Bud passed away in 2017, Alan, Teri, and Steve distributed Bud's stock equally among themselves.

## C.    Alan purchases Waldon, and Broce salesmen sell Waldon's products.

From 1994 to 2002, Waldon manufactured LayMor's—Broce's competitor's—brooms. Many of Broce's sales employees were former Waldon employees. In late 2011 or early 2012, Alan approached Bud, Teri, and Steve with the idea of Broce purchasing Waldon. Because Steve and Teri opposed the purchase, Alan dropped the idea. Instead, Alan bought 80 percent of Waldon himself.[3] Bud loaned Alan $600,000 to make the purchase.

Alan decided the Broce sales team would sell Waldon's forklifts and loaders. The Broce sales team assured Alan that they could do this as part of their normal travel and that the Broce sales would not suffer as a result. Broce intended for its salesmen to dedicate 20 percent of their time selling Waldon's products.

Steve and Teri were aware of Alan's decision to have the Broce sales team sell Waldon products. They were also aware of the commission structure for Broce personnel to receive for sales of Waldon products. Waldon would pay Broce a commission for the first $1.5 million in

---

[3] Although the timing is not clear, Alan and Julie later became 100 percent owners of Waldon.

sales, and the salesmen would get a one/sixth percentage of that commission as their additional compensation.

Steve claims, however, that he was not fully aware of the details regarding the Broce/Waldon sales arrangement.  First, Steve did not know that Broce intended its salesmen to dedicate 20 percent of their time to selling Waldon's products or that one Broce salesman dedicated 100 percent of his time to selling Waldon's products.  Second, although Alan told Steve that the commission percentage Waldon was to pay Broce was "normal for outside sales," this percentage was based on outside sales for brooms, not specialty loaders, which took more time and effort to sell.  And third, in his monthly meetings with Alan and Teri, Steve asked Alan whether he could get a report on Broce's sales of Waldon's products to see how the sales were going.  Although Broce's sales and profits increased during the time Broce's salespeople were selling Waldon's products, there is no documentation showing how much money Broce actually made on those sales.

**D.    Waldon manufactures a limited number of BB250s.**

In 2014, Broce was selling more brooms, including the BB250, in the busy season than it could readily produce.  Broce's vice-president of sales operations, Terry Wimer, told Alan that Broce's manufacturing backlog was causing Broce to lose sales.  Alan, Teri, and Steve discussed the backlog issues as a group and agreed Waldon would produce a limited number of BB250s to reduce Broce's manufacturing backlog.

Before Waldon began manufacturing the BB250, Waldon and Broce entered into a Confidentiality Agreement.  The Confidentiality Agreement states that Waldon "shall use the Confidential Information only for the purpose of evaluating potential business and investment relationships with Broce Manufacturing Company."  It also prohibited Waldon or any person

associated with Waldon from using confidential information exchanged under the agreement and engaging in any activity that could be construed as "competitive" with Broce.

**E.      Waldon designs and manufactures the BW260 for Broce.**

For many years, Broce struggled to penetrate the three-wheel sweeper market because the BB250's price was about $4,000 more than the price of LayMor's three-wheel sweeper.  As early as 2005, Alan explored ways to reduce the cost of the BB250 with Broce's engineers, who were reluctant to modify the sweeper.  One Broce engineer told Alan that nothing could be done to modify the BB250.  Other Broce engineers told Alan they could reduce the cost of the BB250 by $1,000 if Broce switched to a simpler hitch design and removed the BB250's hydraulic hitch.  Broce's sales team, however, thought that having the hydraulic hitch was very important.

In 2014, a Waldon employee, Greg Wichert, approached Alan and said that he could build a cheaper three-wheel broom than the BB250 based on his years of experience building sweepers at Waldon.  Because Wichert had a vision for the project and experience and because no one at Broce wanted to "champion" the project, Alan decided to let Wichert, and thus, Waldon, take the lead.  Alan, Teri, and Steve discussed Waldon's progress on the project from October 2014 forward, and Steve did not object to Waldon's involvement during those conversations.  Steve now asserts, however, that his acquiescence to the project was not based on full knowledge of the situation.  In designing the cheaper BB250, Waldon, with Alan's knowledge and consent, enlisted an independent contractor, Ricky Heflin, to help with various aspects of the design and development.  Steve claims Broce could have hired Ricky Heflin to do the work, which would have eliminated the need for Waldon to design and build the sweeper.

The parties dispute whether the project resulted in a redesigned/cheaper BB250 or an entirely new three-wheel broom.  Regardless, the redesigned/new broom was named the BW260.

The BW260 contains several design differences from the BB250, but the biggest difference is that the BW260 does not include a hydraulic hitch.

Following the development of the BW260, the Broce board determined that Waldon would manufacture the BW260 for Broce.  Additionally, Alan decided that Waldon would take care of the BW260's product support, including the assumption of warranty costs and the handling of replacement parts.

**F.      The Broce-Waldon Manufacturing Agreement**

From 2012 to 2018, Broce and Waldon did not have a written agreement that governed their relationship.  In December 2017, Steve sent an email to Alan, copying Mike and Teri, questioning the conflicts between the Broce-Waldon transactions, including the development and manufacture of the BW260.  Alan responded stating: (1) Waldon designed the BW260 and therefore "owns"—in his own quotations—the design; (2) Broce bought the BW260 from Waldon and sold it for a higher price; (3) Waldon bore the warranty costs for the BW260; and (4) Waldon inventories and sells service parts for the BW260.

After reading Alan's response, Steve objected to Waldon owning the BW260 and asked for Broce to enter into a written manufacturing agreement with Waldon.  Alan and Teri agreed. Paragraph 2 of the Manufacturing Agreement lets Waldon manufacture Broce's "Products," defined as the "Model BB-250, Model BW260, the front-mounted sweeper currently in development, and any other street sweeper developed hereafter."  Paragraph 2 also prevents Waldon from manufacturing or marketing the Products for any other entity.  Paragraph 9 acknowledges that Broce is the "sole owner of the Products."

**G.**     **Steve hires independent financial review of Broce's books and records.**

Around the same time Steve began questioning the Broce-Waldon transactions, Steve hired an independent third party, Kevin Corbett, to review Broce's books and records.  Steve, Alan, and Teri held a conference call with Corbett on August 20, 2018, to discuss Corbett's findings.  Among other things, Corbett noted that:  (1) Broce lacked a formal arrangement with Waldon and there needs to be clarity in related party transactions; (2) Broce should evaluate whether Waldon producing the BW260 was the best alternative; and (3) Broce entered a uniquely low-margin deal on the BW260 with Ahern Rental.[4]  Corbett concluded that Broce was "a very nice business."

With respect to the Ahern deal, Alan previously explained his reasoning in an email to Broce's vice-president of sales, Terry Wimer,

> I am inclined to go pretty thin to get this deal.  To be honest, this is more important to Waldon than it is to Broce. Waldon **needs** to sell about 250 BW260's this year and I don't see that happening without this deal.  For Broce, the margins are not great but the net revenue is still good for not a lot of work on our part.

Alan continued:  "Plus there is the benefit of a long-term (hopefully) relationship with Ahern that will include many more sales . . . . There's part sales, there's the immeasurable benefit of visibility . . . . Bottom line – I really want to see this go through," and "Waldon will have to give up some margin on this."

**H.**     **Waldon designs a front-mounted sweeper, the FMJ470, for Broce.**

For several years, Alan and the Broce sales team talked about developing a front-mounted sweeper.  In January 2018, Alan emailed Steve informing him that Waldon was developing a front-

---

[4] The parties do not explain who Ahern Rental is or why Ahern Rental was doing business with Broce.

mounted broom and that he planned to operate under an arrangement like the BW260 when it was ready to take it to market.

In September 2018, the Broce board met to discuss the front-mounted broom—the FMJ470. Among other things, the board considered (1) the history of front-mounted broom sales in the United States; (2) the positive and negative attributes of the front-mounted broom; (3) alternatives to developing a front-mounted broom; and (4) the costs and feasibility of Broce designing, producing, and selling a front-mounted broom. Accordingly, the Broce board, acting through Teri, Alan, and Mike, resolved that Broce would pursue the design, manufacture, and sale of the FMJ470 under the Manufacturing Agreement between Broce and Waldon. The Broce board also agreed that Broce would pay for the designs, jigs, and molds created for the manufacture of the front-mounted broom by Waldon. Because Steve had previously objected to Waldon owning the BW260, Broce owned the rights to the front-mounted broom under the Manufacturing Agreement.

## I.     Steve files suit against Alan, Teri, Mike, and Julie over the trust and ranch.

In December 2018, the Broce board voted not to make a distribution to shareholders. At the time the board made this decision, Steve was threatening litigation against Broce and its directors. He told Alan and Teri in a phone conversation he recorded, without Alan or Teri's knowledge, that he's "won more lawsuits than I should have." He further stated: "The only way I've ever won one of these deals is you have to increase the risk to the other side," and he did that "by minimizing what our lawyer does, and then forcing crazy stuff on [the other side], in a legal way, that his lawyer would have to spend time on."

In the spring of 2019, Steve filed three lawsuits: one against Alan, Teri, Mike, and Julie over the family's ranch (the "ranch case"); another against Alan and Teri over the family's trusts

(the "trust case"); and this action against Alan, Teri, Mike, and Julie, over Broce. The ranch case and the trust case were filed in Oklahoma state court. In the ranch case, Steve seeks, among other things, damages for alleged shareholder oppression and alleged breaches of fiduciary duty and partition of the ranch. Among other allegations, Steve alleges that the dissolution is necessary based on Teri's actions of remodeling an old barn before her daughter's wedding and replacing a horse corral with a garden.

In the trust case, Steve seeks to have Alan and Teri removed as trustees, an accounting of his mother's trust, distribution and termination of his mother's trust estate, and an accounting of his father's trust. Steve alleges that Alan and Teri, as trustees, breached their fiduciary duties to the trust because they failed to accelerate a loan the trust made to Broce. Steve also alleges that Alan and Teri, as trustees, breached their fiduciary duty to Steve because they intended to sell the property where Broce's facility is located to Broce, rather than distribute the interests in the property in undivided equal shares to Steve, Teri, and Alan.

**J.      Broce acquires Waldon's assets and liabilities.**

In an August 2018 email, Mike proposed to Alan that Broce could buy Waldon's assets to solve the "Waldon/Broce conflict of interest problem." Mike also recommended that Alan sell Waldon's assets to Broce for the amount Alan put into Waldon with no profit. Mike said that he focused on that amount because Steve made repeated allegations that Alan was being unduly enriched. Alan responded positively to the suggestion stating that it "would not only solve the conflict of interest issues but would also create efficiencies and synergies that, I believe, would make Broce a better and more profitable company."

The Broce board agreed in a written resolution that BKD, an accounting firm, would provide valuation services in connection with the proposed purchase of Waldon. The parties

dispute whether the accounting firm's valuation of Waldon's assets was correct.  Both Mike and Teri relied on BKD's valuation.

Before Broce bought Waldon's assets, Steve raised the concern that Broce needed to make a clear business case for buying Waldon's assets.  Accordingly, in November 2019, Mike, through his attorney, prepared a business case for Broce's acquisition of Waldon's assets.  The business case evaluated three options: (1) the status quo; (2) investing capital in Broce's own facility; and (3) buying Waldon's assets.  The business case concluded that buying Waldon's assets was "a good, safe investment" because the company was profitable in 2019 and the profits would likely increase with the front-mounted broom in development.  Steve disputes that the business case accurately weighed the three options.

On December 3, 2019, the Broce board convened a special meeting to review the business case and determine whether Broce should enter the Asset Purchase Agreement.  Alan and Julie disclosed their interest in Waldon at the meeting and abstained from voting.  Teri and Mike voted in favor of purchasing Waldon's assets.  The Broce board then notified Steve that they intended to proceed with the transaction and sent him the proposed contract for the transaction.

On December 17, Broce and Waldon entered into the Asset Purchase Agreement.  Under the terms of the Asset Purchase Agreement, Broce acquired Waldon's assets, which includes but is not limited to real property and fixtures, vehicles and rolling stock, tangible personal property, customer lists, records and files, general intangibles, and receivables.  Broce also acquired all of Waldon's liabilities.

 Other than Broce's payment under the Asset Purchase Agreement, Alan never received a salary or distributions from Waldon.  Alan's salary was fully paid by Broce, but Alan spent 50

percent of his professional time on Waldon.  Broce also paid for Alan's expenses associated with Waldon.

**K.      This litigation**

Steve commenced this action in May 2019 against Director Defendants, Waldon, and Nominal Defendant Broce.  He asserts shareholder derivative claims on behalf of Broce against Director Defendants for breach of fiduciary duty, unjust enrichment, and corporate waste.  As to his breach of fiduciary duty claim against Alan, Steve asserts numerous breaches of the duty of loyalty and the duty of care, seven of which fall under both duties.  Specifically, Steve alleges that Alan breached the duties of loyalty and care by (1) failing to enforce the Confidentiality Agreement and the Manufacturing Agreement against Waldon; (2) requiring Broce to subsidize Waldon by having Broce pay 100 percent of his salary; (3) ordering Broce to overcompensate Teri; (4) engaging Waldon, an inefficient manufacturing company, to build the FMJ470 (the front-mounted broom); (5) requiring Broce to purchase assets related to Waldon's failed legacy business and requiring Broce to fund the losing enterprise; (6) permitting Waldon to dictate disadvantageous commercial terms to Broce; and (7) permitting Waldon to receive 100 percent of the BW260 parts revenue.

Additionally, Steve alleges that Alan breached the duty of loyalty by engaging in millions of dollars of self-dealing transactions that were not entirely fair to Broce.  He further alleges that Alan breached by (1) failing to disclose material information and/or providing false information to the Broce board and shareholders regarding his self-dealing; (2) failing to disclose a corporate opportunity to Broce and usurping it for Waldon's benefit; (3) allowing the transfer of Broce intellectual property and assets to Waldon without compensation; (4) colluding with other

shareholders so they would acquiesce to his self-dealing; and (5) ordering Broce employees to serve Waldon's interests without adequate compensation.

Steve also alleges that Alan breached breached the duty of care by allowing Broce's assets and opportunities to flow to Waldon while failing to capitalize on Broce's ability to manufacture and sell a less expensive or "partially modified" BB250.  Steve alleges that Alan further breached by (1) failing to consider alternative to further integrations with Waldon to address Broce's capacity issues; (2) permitting Waldon to profit from the Broce name and market position without adequate compensation; (3) failing to secure any written agreement with Broce before September 2018; (4) improperly reducing Steve's shareholder percentage; and (5) failing to ensure proper and adequate accounting at Broce.

As to Teri, Steve alleges that she breached her fiduciary duties of loyalty and care by failing to independently evaluate in good faith Alan's (and subsequently Julie's) self-dealing transactions, culminating in her approval of Broce's acquisition of Waldon for an over-valued price.  Steve further alleges that Teri:  (1) failed to conduct legitimate investigations, in real-time, regarding Alan's self-dealing; (2) allowed Alan to be paid 100 percent by Broce while only 50 percent of his professional efforts were directed toward Broce; (3) failed to challenge Alan due to her financial dependence on him; (4) colluded with Alan so he would acquiesce to her wish in the ranch; (5) failed to enforce the Confidentiality Agreement and Manufacturing Agreement against Waldon; (6) permitted Waldon to receive all of the BW260 parts revenue; (7) permitted Broce's corporate assets and opportunities to flow to Waldon; (8) reduced or eliminated shareholder distributions to oppress a shareholder; (9) failed to ensure proper and adequate accounting at Broce; and (10) overcompensated herself and Alan.

Steve's allegations against Mike are the same as those against Teri.  Except, unlike the allegations against Teri, Steve does *not* assert that (1) Mike failed to conduct investigations in real time as to Alan's self-dealing; (2) Mike allowed Waldon to receive 100 percent of the BW260 parts revenue; or (3) Mike permitted Broce's corporate assets and opportunities to flow to Waldon.

As to Julie, Steve asserts that she breached her fiduciary duties by (1) engaging in a multi-million dollar transaction—Broce's asset purchase of Waldon—that was not entirely fair to Broce; (2) failing to disclose to Broce shareholders all material facts related to her self-dealing; (3) ordering Broce to overcompensate Teri; (4) failing to enforce the Confidentiality Agreement and Manufacturing Agreement against Waldon; (5) permitting Waldon to receive 100 percent of the BW260 parts revenue; and (6) reducing or eliminating shareholder distributions to oppress a shareholder.

 In addition to his shareholder derivative claims against Director Defendants, Steve asserts an individual claim against Alan, Teri, and Mike for breach of fiduciary duty for improperly reducing his shareholder percentage.  Steve also asserts an unjust enrichment claim against Waldon.

Steve seeks approximately $11.6 million in damages on behalf of Broce for breach of Director Defendants' fiduciary duties, approximately $5.3 million in damages for Director Defendants' unjust enrichment, and approximately $1.9 million in damages for Director Defendants' corporate waste.  He also seeks approximately $1.5 million in damages individually against Director Defendants for decreasing his shareholder percentage.  Finally, Steve seeks punitive damages as to his breach of fiduciary duty claims.

## II.    Legal Standard

Summary judgment is appropriate if the moving party demonstrates that there is no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law.[5]  A fact is "material" when it is essential to the claim, and issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor.[6]  The Court views all evidence and reasonable inferences in the light most favorable to the party opposing summary judgment.[7]

The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim.[8]  If the movant carries its initial burden, the nonmovant may not simply rest on its pleading but must instead "set forth specific facts" that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant.[9]  These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment.[10]

When a defendant moves for summary judgment based on an affirmative defense, "[t]he defendant . . . must demonstrate that no disputed material fact exists regarding the affirmative

---

[5] Fed. R. Civ. P. 56(a).

[6] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[7] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[8] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 325 (1986)).

[9] *Id.* (citing Fed. R. Civ. P. 56(e)).

[10] *Mitchell v. City of Moore*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir. 1998)).

defense asserted."[11]   Once the defendant has met this burden, "the plaintiff must then demonstrate with specificity the existence of a disputed material fact."[12]   If the plaintiff cannot meet this burden, "the affirmative defense bars [the] claim, and the defendant is then entitled to summary judgment as a matter of law."[13]

### III.    Analysis

This action is a shareholder derivative lawsuit.   A derivative lawsuit "is a suit by a shareholder to enforce a corporate cause of action . . . [a]nd the relief which is granted is a judgment against a third person in favor of the corporation."[14]   In other words, a plaintiff in a derivative action "step[s] into the corporation's shoes . . . to seek in its right the restitution he could not demand on his own."[15]   Here, Steve has stepped into Broce's shoes to assert claims for breach of fiduciary duty, unjust enrichment, and corporate waste on behalf of Broce.

### A.    Director Defendants' Motion for Summary Judgment (Doc. 193)

Director Defendants seek summary judgment on the following grounds:  (1) Steve is not a suitable plaintiff under Federal Rule of Civil Procedure 23.1; (2) Steve's claims are barred by the business judgment rule; (3) Alan, Teri, and Mike are fully protected because they relied on the advice of Broce's employees to make their decisions; (4) Steve's claims are barred by estoppel; (5) Steve's unclean hands preclude him from arguing Broce should have made capital improvements to its facility; (6) Steve's direct claim against Teri and Alan for reducing his stock

---

[11] *Hutchinson v. Pfeil*, 105 F.3d 562, 564 (10th Cir. 1997) (citations omitted).

[12] *Id.*

[13] *Id.*

[14] *Price v. Gurney*, 324 U.S. 100, 105 (1945).

[15] *Cohen v. Beneficial Indus. Loan Corp.*, 337 U.S. 541, 548 (1949).

percentage is time-barred and fails on the merits; (7) Steve's unjust enrichment claim fails on the merits; and (8) Steve cannot seek punitive damages.   The Court addresses each of Director Defendants' arguments below.

### 1.      Steve's Ability to Serve as Derivative Plaintiff under Rule 23.1

Director Defendants argue that Steve cannot maintain a claim on behalf of Broce under Federal Rule of Civil Procedure 23.1.   Under that rule, a shareholder derivative suit may only be maintained if the plaintiff "fairly and adequately represent the interests of the shareholders . . . who are similarly situated."[16]   The rule's purpose is to ensure no conflicts exist between the other "similarly situated" shareholders the plaintiff wishes to represent and the corporation itself.[17]   The burden is on Director Defendants to show that Steve does not meet Rule 23.1's requirements.[18]

The Tenth Circuit has not addressed when a plaintiff "fairly and adequately represents" the interests of similarly situated shareholders in a derivative action.   Director Defendants ask the Court to employ an eight-factor test used by the Sixth, Ninth, Third, and Eleventh Circuits, which considers (1) economic antagonism between the plaintiff and the class; (2) the remedy the plaintiff seeks; (3) whether the plaintiff is the "driving force" in the litigation; (4) the plaintiff's familiarity with the litigation; (5) other litigation pending between the plaintiff and defendants; (6) the magnitude of the plaintiff's personal interests, versus his interest in the litigation; (7) the plaintiff's

---

[16] Fed. R. Civ. P. 23.1(a).

[17] Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1833 (3d ed. 2016).

[18] *E.g.*, *Smallwood v. Pearl Brewing Co.*, 489 F.2d 579, 592 n.15 (5th Cir. 1974); *ShoreGood Water Co., Inc. v. U.S. Bottling Co.*, 2009 WL 2461689, at *4 (D. Md. 2009) (citing *Smallwood*, 489 F.2d at 592, n.15).

"vindictiveness;" and (8) the amount of support from those shareholders he represents.[19]  Steve does not dispute that these factors are applicable to a Rule 23.1 analysis, and therefore, the Court will apply them to the facts of this case to determine if Steve is a suitable derivative plaintiff.

As to the first factor, economic antagonism, Director Defendants argue that Steve's economic interests are antagonistic to every other Broce shareholder because he seeks compensatory and punitive damages from them all.  But Director Defendants are not similarly situated to Steve.  Director Defendants are the majority shareholders; Steve represents the minority.  "Similarly situated shareholders do not include majority shareholders opposed to the derivative action, for otherwise a derivative suit could not be brought if the interest of the controlling shareholders coincided with those of the defendants."[20]  Whether Steve's economic interests are opposed to Director Defendants' interests is therefore irrelevant to the Court's inquiry.

Director Defendants also argue that Steve's economic interests are antagonistic to Broce because any recovery Steve seeks will come from the same pool of money—Alan, Mike, Teri, and Julie individually.  The cases Defendants rely upon in support of this argument, however, are unpersuasive.[21]  Those cases concern a plaintiff seeking derivative damages from the corporation and direct personal damages from the corporation.[22]  This conflict is obvious.  Unlike those cases,

---

[19] *Davis v. Comed, Inc*., 619 F.2d 588, 593-94 (6th Cir 1980); *Rothenberg v. SEC Mgmt. Co*., 667 F.2d 958, 961 (11th Cir. 1982); *Vanderbilt v. Geo-Energy, Ltd*., 725 F.2d 204, 207 (3d Cir. 1983) (citation omitted); *Larson v. Dumke*, 900 F.2d 1363, 1367 (9th Cir. 1990) (citations omitted).

[20] *Penn, LCC v. Prosper Bus. Dev. Corp*., 2011 WL 2118072, at *6 (S.D. Ohio 2011) (quoting 5 James Wm. Moore et al., Moore's Federal Practice ¶ 23.0.09[4] (3d ed. 1997); *see also* Federal Practice and Procedure § 1833 ("[T]he second sentence of Rule 23.1(a) must be read as only requiring plaintiff to be an adequate representative for those 'similarly situated' shareholders—namely, the minority stockholders.").

[21] *See Prime Mover Cap. Partners, LP v. Elixir Gaming Tech, Inc.*, 898 F. Supp. 2d 673 (S.D.N.Y. 2012); *Jannuzzio v. Danby*, 2022 WL 2541678 (E.D. Pa. 2022); *ShoreGood Water Co.*, 2009 WL 2461689.

[22] *Prime Mover Cap. Partners*, 898 F. Supp. 2d at 692; *Januzzio*, 2022 WL at *16; *ShoreGood Water*, 2009 WL 2461689, at *4-5.

however, Steve has an individual claim that seeks damages from Director Defendants individually, not Broce.  Accordingly, this factor favors a finding that Steve is a suitable derivative plaintiff.

As to the second factor, the remedy sought by the plaintiff in the derivative action, Director Defendants argue that Steve seeks "extreme remedies" in both this case and in the two other cases he filed against Director Defendants.  The Court is not concerned with the damages Steve seeks in the two other cases he filed against Director Defendants because this factor focuses on the remedy the plaintiff seeks in this derivative action.  Director Defendants also argue that Steve seeks to "punish" them in this action because he seeks punitive damages that are unwarranted.  Punitive damages, however, are an available remedy in a derivative suit.[23]  Furthermore, as discussed below, the Court finds that there is a genuine issue of material fact as to whether such damages should be awarded in this case.  Therefore, the Court finds that this factor does not support Director Defendants' argument that Steve is an inadequate plaintiff under Rule 23.1.

Director Defendants concede that the third and fourth factors, whether Steve is the driving force behind this litigation and is familiar with this litigation, weigh in Steve's favor.  Thus, these factors support a finding that Steve is a suitable derivative plaintiff.

As to factors five and six, other litigation between the parties and the relative magnitude of Steve's personal interests as compared to the derivative action itself, Director Defendants address these together.  Director Defendants argue that Steve has a personal interest and ulterior motive to filing his derivative claims because Steve filed three coordinated lawsuits, including this one, against them in a three-month span.  They claim that Steve waited to file the lawsuits after Bud,

---

[23] *Newton v. Hornblower*, 224 Kan. 506, 582 P.2d 1136, 1150 (1978) (citations omitted).

their father, died and that Steve has stated that he has only won past lawsuits by increasing risk to the other side.

Steve does not dispute that he has filed two other lawsuits against Plaintiff or that he previously stated that the only way he has ever won a lawsuit is to increase risk to the other side. However, Steve has come forward with evidence showing that he did not learn of Alan's alleged mis-dealings until after Bud died, and after he learned of them, he increased his objections to Director Defendants' actions and later filed this suit. Steve further argues that he filed this suit not for selfish reasons but to benefit Broce. Steve points out that he is seeking $11 million in damages for Broce and only $1.5 million in damages for himself. Additionally, Kansas does not allow a prevailing derivative plaintiff to recover attorneys' fees.[24] Steve argues that the cost of this litigation will likely outpace any recovery he may have individually, indicating that this litigation is primarily for Broce's benefit.

It is a close call whether factors five and six favor a finding that Steve is a suitable plaintiff. On one hand, the fact that Steve has filed two other lawsuits and admitted that his litigation strategy is to increase risk to the other side suggests that Steve may be using this derivative suit as a bargaining chip in the other cases. On the other hand, the $9.5 million disparity in the amount of damages Steve is seeking on behalf of Broce compared to those he is seeking individually suggests that he is not acting entirely for selfish reasons, especially when he has no chance to recover attorneys' fees for the derivative claims. Overall, the Court finds Director Defendants' argument

---

[24] *See Newton*, 582 P.2d at 1151 (reversing the trial court's award of attorneys' fees in a shareholder derivative action because attorneys' fees are not available absent statutory authority).

slightly more persuasive, and thus, these factors weigh against finding that Steve is a suitable derivative plaintiff.

Director Defendants next argue that Steve's vindictiveness prevents him from being a fair and adequate derivative plaintiff. Director Defendants paint Steve as the disgraced son who ran the family business into the ground. They claim that Steve approved Alan's and the Broce Board's decisions and never complained about Broce's management until Bud died, but after that he became "murderously angry" at his siblings and filed three lawsuits against them. Director Defendants argue that this vindictiveness prevents Steve from being a fair and adequate plaintiff because there is no way he will settle his derivative claims.

Director Defendants' recitation of the Vance family history is disputed by Steve. He points out that Director Defendants do not have any evidence showing that it was Steve's, and not Bud's, mismanagement that caused Broce Construction to fail. Furthermore, Steve has come forward with evidence creating a genuine issue of material fact as to Broce's profitability while under Alan's control. He has also come forward with evidence showing that he did not begin objecting to the Director Defendants' decisions regarding the management and operation of Broce until after he learned of Alan's alleged mis-dealings. Thus, there is a genuine issue of material fact as to whether Steve "approved of" the Broce Board's decisions. Read in the light most favorable to Steve, the undisputed facts do not indicate that Steve has acted vindictively. Therefore, this factor weighs in favor of finding Steve is a suitable derivative plaintiff.

The final factor, the amount of support from the shareholders he represents, is inapplicable here because Steve is a class of one. The Court recognizes that Steve's status as a class of one is an unusual factual scenario that the Tenth Circuit has not addressed. Federal courts outside the Tenth Circuit, however, have allowed a single minority shareholder to assert derivative claims

based on equitable considerations.[25]  These courts have reasoned that if a class of one were not allowed, then a minority shareholder would be left without a remedy for shareholder or director misconduct.[26]  Thus, the fact that Steve is a single derivative plaintiff does not disqualify him from bringing derivative claims.

Overall, the Court concludes that Director Defendants have not met their burden to show the eight factor test weighs in favor of finding that Steve is not a suitable derivative plaintiff. Director Defendants concede that Steve is the driving force behind the litigation and familiar with it.  And, Steve has come forward with evidence indicating that he is not pursuing the lawsuit based on his vindictiveness and the remedy he seeks is not unwarranted.  Additionally, as a class of one in a close corporation, Steve would be left without a potential remedy if he could not assert claims on behalf of Broce against Director Defendants.  Accordingly, the Court concludes that Rule 23.1(a) is satisfied.

2.  *The Business Judgment Rule*

Director Defendants contend that they are not liable under the business judgment rule and Kansas statutory law governing corporations.  The parties assert, and the Court agrees, that Kansas law governs Steve's claims.  This is a diversity action, and therefore, the Court applies Kansas' choice of law rules.[27]  "The generally accepted rule is that a corporation's charter and the laws of its domicile govern with respect to the fact and duration of corporate existence and the rights and

---

[25] *Austar Int'l Ltd. v. Austar Pharma, LLC*, 425 F. Supp. 3d 336, 351 (D.N.J. 2019) (collecting cases from the Ninth Circuit, District of New Jersey, and the Western District of Virginia).

[26] *Id*. (citing *Joseph Oats Holdings, Inc. v. RCM Digesters, Inc*., 2008 WL 11381898, at *5 (D.N.J. 2008); *Halsted Video, Inc. v. Guttillo*, 115 F.R.D. 177, 179 (N.D. Ill. 1987)).

[27] *See Klaxon Co. v. Stentor Elec. Mfg. Co*., 313 U.S. 487, 496–97 (1941).

liabilities of its officers, stockholders, and directors."[28]  Because Broce is a Kansas corporation, Kansas law applies.

It is well-established in Kansas that corporate directors are shielded from liability through the business judgment rule.[29]  "This rule is a presumption that in making business decisions not involving direct self-interest or self-dealing, corporate directors act on an informed basis, in good faith, and in the honest belief that their actions are in the corporation's best interest."[30]  Directors and officers are immune "from liability for unprofitable or harmful corporate transactions if the transactions were made in good faith, with due care, and within the directors' or officers' authority."[31]

The business judgment rule is a rebuttable presumption, and the initial burden is on the party challenging a corporate decision to establish the defendant's "self-dealing or other disabling factor."[32]  A plaintiff may do this by showing the director is either interested in the transaction or beholden to another party, *i.e.,* not independent.[33]  If a plaintiff meets this burden, then the presumption of the rule is rebutted, and the burden shifts to the defendant to show that the transaction was "entirely fair" to the corporation.[34]

---

[28] *Consol. Beef Indus., Inc. v. Schuyler*, 239 Kan. 38, 716 P.2d 544, 547 (1986).

[29] *Becker v. Knoll*, 291 Kan. 204, 239 P.3d 830, 834 (2010).

[30] *Id.*

[31] *Kan. Heart Hosp., LLC, v. Idbeis*, 286 Kan. 183, 184 P.3d 866, 885 (2008) (quoting *Burcham v. Unison Bancorp, Inc.*, 276 Kan. 393, 77 P.3d 130, 147 (2003)).

[32] *Becker*, 239 P.3d at 835.

[33] *Orman v. Cullman*, 794 A.2d 5, 22 (Del. 2002); *see also Kan. Heart Hosp.*, 184 P.3d at 878 (referring to Kansas courts' "long history of looking to Delaware for guidance when applying the Kansas General Corporation Code").

[34] *Becker*, 239 P.3d at 835.

-23-

Director Defendants offer several arguments as to why the business judgment rule shields them from liability as to the Broce-Waldon transactions and Broce's business decisions unrelated to Waldon. The Court addresses them below.

> a.      The Broce-Waldon Transactions and K.S.A. § 17-6304(a)(1)

Director Defendants argue that they are not liable based on K.S.A. § 17-6304(a)(1). That statute provides that a contract or transaction in which a director has a financial interest is not void or voidable if "the material facts as to the director's . . . relationship or interest and as to the contract or transaction are disclosed or are known to the board of directors" and the board "in good faith authorizes the contract or transaction by the affirmative votes of a majority of the disinterested directors, even though the disinterested directors be less than a quorum."

According to Director Defendants, satisfaction of K.S.A. § 17-6304(a)(1)'s requirements removes "any taint of a director's self-interest in a transaction" and results in application of the business judgment rule. Steve disagrees arguing that that satisfaction of K.S.A. § 17-6304(a)(1) simply means the transaction is not void or voidable. According to Steve, Director Defendants must still show that the Broce-Waldon transactions were entirely fair to Broce. The Court need not resolve this issue at this time, however, because there are genuine issues of material fact as to whether K.S.A. § 17-6304(a)(1)'s requirements are met.

> i.      The Broce-Waldon Transactions from 2012 to 2019

Director Defendants argue that K.S.A. § 17-6304(a)(1) is satisfied as to the Broce-Waldon transactions between 2012 and 2019 because (1) Teri, Mike, and Bud were neither interested in Waldon nor dependent on Alan; (2) Alan disclosed Waldon's transactions to Teri, Mike, and Bud; and (3) Teri, Mike, and Bud were a majority of disinterested and independent directors who approved and ratified Broce's transactions with Waldon.

-24-

The Court first addresses whether Teri, Mike, and Bud were "disinterested directors" under K.S.A. § 17-6304(a)(1).  There is a distinction between a disinterested director and an independent director.[35]  "A director is interested where the director has a financial or pecuniary interest in a transaction other than that which devolves to the corporation or to all of the shareholders generally."[36]  A director is "independent" where "a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences."[37]  Both Steve and Director Defendants treat the term "disinterested directors" in K.S.A. § 17-6304(a)(1) as directors who are both disinterested *and* independent.  This is consistent with Delaware law discussing an identical statute to K.S.A. § 17-6304(a)(1)—Del. Cod. Ann. tit. 8 § 144(a)(1).[38]  "Kansas courts have a long history [] of looking to the decisions of the Delaware courts involving corporation law, as the Kansas Corporation Code was modeled after the Delaware Code."[39]  Therefore, in determining whether Teri, Mike, and Bud's alleged ratification satisfies K.S.A. § 17-6304(a)(1), the Court examines whether they were disinterested and independent.

Steve argues that Teri, Mike, and Bud were interested in the Broce-Waldon transactions because of Alan's alleged self-dealing in all of them.  This argument implies that if one director engages in self-dealing, then all the other directors did so as well.  Steve's argument relies on

---

[35] *See Orman*, 794 A.2d at 25 n.50 (stating that interest and independence are two distinct issues).

[36] *Kan. Heart Hosp.*, 184 P.3d at 886-87 (citation omitted); *see also Orman*, 794 A.2d at 23 (stating that "interest" means that "directors can neither appear on both side of a transaction nor expect to derive any personal financial benefit from it in the sense of self-dealing, as opposed to a benefit which devolves upon the corporation or all stockholders generally").

[37] *Burcham*, 77 P.3d at 149 (citing *Aronson v. Lewis*, 473 A.2d 805, 816 (Del. 1984)).

[38] *See In re Walt Disney Co. Derivative Litig.*, 907 A.2d 693, 756 n.464 (Del. Ch. 2005) (stating that an inside transaction is valid "where the *independent and disinterested* (loyal) directors understood that the transaction would benefit a colleague") (emphasis added).

[39] *Arnaud v. Stockgrowers State Bank of Ashland*, 268 Kan. 163, 992 P.2d 116, 218 (1999) (citations omitted).

*Becker v. Knoll*,[40] a shareholder derivative suit against a corporate director who employed one of the corporation's employees for his private enterprise.[41] *Becker*, however, only involved one director, and not multiple directors as in this case.[42] Furthermore, nowhere in *Becker* does the Kansas Supreme Court hold that one director's self-dealing may be imputed to another director for purposes of the business judgment rule. Therefore, contrary to Steve's argument, Alan's alleged self-dealing does not automatically convert Teri, Mike, and Bud into interested directors.

Steve next argues that there is a genuine issue of material fact as to whether Teri, Mike, and Bud are independent directors. The Court is more persuaded by this argument. It is undisputed that Bud and Teri had/have a close familial relationship with Alan.[43] Steve has also produced evidence showing that Bud, Teri, and Mike may have been influenced by Waldon's profitability or lack thereof. Bud loaned Alan $600,000 to purchase an 80 percent stake in Waldon. And, Teri and Mike loaned Alan money for Waldon's operations. Although the exact details of the loan are unknown, Alan testified in his deposition that Waldon was having problems with cash-flow, and Teri and Mike loaned him $200,000. Additionally, Steve has come forward with evidence that Teri was over-compensated for her work as a director while Alan was in control of Broce and the board. Teri argues this salary did not influence her, but this is a credibility issue that is not resolved on summary judgment. Given this evidence, the Court concludes that there is a genuine issue of material fact as to whether Teri, Mike, and Bud were independent directors. Accordingly, the

---

[40] 239 P.3d 830.

[41] *Id*. at 832-33.

[42] *Id*. at 832.

[43] *See Harbor Fin. Partners v. Huizenga*, 751 A.2d 879, 889 (Del. Ch. 1999) (analyzing independence of directors in the demand-futility context and finding that a familial relationship raised a reasonable doubt as to whether a brother-in-law could be impartial).

Court denies summary judgment as to Director Defendants' claim that they are not liable under K.S.A. § 17-6304(a)(1).

In the alternative, the Court denies summary judgment because there are genuine issues of material fact regarding whether a majority of disinterested directors affirmatively approved Broce's transactions with Waldon. From 2012 to the end of 2017, the Broce board consisted of Alan, Teri, and Bud. Bud passed away in December 2017, and Mike took his place in 2018. Director Defendants do not point to any admissible evidence that Bud affirmatively approved the Broce-Waldon transactions from 2012 to 2017. At most Teri stated in her declaration that Bud was aware of everything that was going on at Broce and that he never expressed any disapproval of Alan's or Teri's decisions. Teri's memory that Bud never expressed disapproval, however, is not the same as an affirmative vote of a disinterested director, which is what K.S.A. § 17-6304(a)(1) requires.[44] Thus, there is a genuine issue of material fact as to whether Bud approved of the Broce-Waldon transactions, and the Court denies summary judgment on this basis as well.

## ii. The Broce-Waldon Acquisition

Director Defendants also rely on K.S.A. § 17-6304(a)(1) in arguing that they are shielded from liability as to the Broce-Waldon acquisition. At the time of the acquisition, the Broce board consisted of Alan and his wife, Julie, and Teri and her husband, Mike. Director Defendants argue that because Teri and Mike were disinterested directors who were fully informed of the transaction and affirmatively approved it, they are not liable for any breach of fiduciary duty as to the acquisition. In response, Steve argues that there are genuine issues of material fact regarding whether Teri and Mike were independent directors and whether they approved the transaction in

---

[44] K.S.A. § 17-6304(a)(1).

good faith.  Thus, Steve contends that K.S.A. § 17-6304(a)(1) does not shield Director Defendants from liability.

The Court agrees with Steve.  As discussed above, Steve has come forward with evidence creating a genuine issue of material fact as to whether Teri and Mike were independent directors. Furthermore, there is a genuine issue of material fact as to whether Teri's and Mike's approval of the acquisition was in good faith.[45]  Steve has produced evidence that as late as August 2018, Alan admitted that Waldon needed cash, and that Teri and Mike offered to lend Alan/Waldon $300,000. Furthermore, Steve's expert opines that Broce overpaid Alan and Julie for Waldon's assets by millions of dollars.  Accordingly, the Court denies summary judgment on the basis that Director Defendants are protected from the liability under K.S.A. § 17-6304(a)(1).

> b.  Director Defendants' Alleged Failure to Enforce the Confidentiality Agreement and Manufacturing Agreement

Director Defendants next seek summary judgment on Steve's claim that they failed to enforce the Confidentiality Agreement and Manufacturing Agreement against Waldon.  Director Defendants argue that because these claims allege board inaction, Steve must meet the *Rales*[46] standard of review.  Director Defendants assert that under this standard, Steve must show the directors either (1) failed to implement "any reporting or information system or controls" or (2) "having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risks or problems requiring their attention."[47]  According to them, Steve cannot make either showing.

---

[45] *See id*. (stating that a majority of disinterested directors must approve the transaction in good faith).

[46] *Rales v. Blasland*, 634 A.2d 297 (Del. 1993).

[47] Director Defendants cite *City of Cambridge Ret. Sys. v. Ersek*, 921 F.3d 912, 918 (10th Cir. 2019).

In response, Steve argues that the *Rales* standard is not applicable because Kansas has not adopted it.  He further argues that even if the Court does apply the test, his allegations are supported by the record.

Neither party recognizes that the test Director Defendants seek to impose is not the *Rales* standard of review.  The *Rales* standard arises in the context of demand futility under Rule 23.1 and requires the plaintiff to "plead facts specific to each director[] demonstrating that at least half of them could not have exercised disinterested business judgment in responding to a demand."[48] Director Defendants have not raised demand futility in their motion, and therefore *Rales* is inapplicable here.

The two-part test Director Defendants seek to impose was established in the seminal Delaware case *In re Caremark International Inc. Shareholder Litigation*.[49]   In that case, the Delaware Court of Chancery held that for claims alleging failure of board oversight the plaintiff must allege "particularized allegations that the board [1] 'utterly failed to implement any reporting or information systems or controls' or [2] 'having implemented such a system or controls, consciously failed to monitor or oversee its operations thus disabling themselves from being informed of risk or problems requiring their attention.' "[50]  The Delaware Supreme Court adopted this test in *Stone v. Ritter*, holding that *Caremark* set forth the necessary conditions predicate for director oversight liability.[51]  Thus, what Director Defendants meant to argue was that Steve cannot

---

[48] *City of Cambridge Ret. Sys.*, 921 F.3d at 919-20 (10th Cir. 2019) (quoting *Desimone v. Barrows*, 924 A.2d 908, 943 (Del. Ch. 2007) (emphasis omitted).

[49] 698 A.2d 959 (Del. Ch. 1996).

[50] *City of Cambridge Ret. Sys.*, 921 F.3d at 920 (quoting *Stone v. Ritter*, 911 A.2d 362, 369, 370 (Del. 2006)).

[51] *Stone*, 911 A.2d at 370.

meet his burden under the *Caremark* test as to his claim that Director Defendants' failed to enforce the Confidentiality Agreement and Manufacturing Agreement.[52]

Having reviewed Delaware case law, the Court concludes that *Caremark* is inapplicable to the facts of this case, and thus the Court need not determine whether Kansas would adopt this test. *Caremark* claims allege failure of board oversight.[53]  They typically allege that the board failed to properly monitor or oversee employee misconduct or violations of law.[54]  For example, in *Caremark*, the plaintiff alleged that the board was liable because they should have known certain officers and directors were violating the Anti-Referral Payments law.[55]  And, in *Stone*, the plaintiff alleged the directors should have known the company's employees were violating the federal Bank Secrecy Act.[56]

Steve's claim against Director Defendants does not allege an overall failure to monitor Broce employees or a failure to prevent violations of the law.  Instead, Steve alleges that Teri did not read or consider the Confidentiality Agreement when Alan told her that Waldon owned the BW260.  He also alleges that under the Manufacturing Agreement, Broce was the owner of all products manufactured by Waldon and their related parts, but Teri and Mike both falsely asserted in 2019 that Waldon still owned the BW260 and its back-end parts business.  Steve claims that

---

[52] The Court recognizes that the *Rales* standard and *Caremark* test are typically applied together in the procedural context of a motion to dismiss based on demand futility.  Few Delaware cases address *Caremark* in the procedural context of a motion for summary judgment.  This perhaps explains Director Defendants' mistake.  Because Director Defendants have set forth the *Caremark* test and argued its application in their motion, the Court will proceed to the merits of the parties' arguments.

[53] *City of Cambridge Ret. Sys.*, 921 F.3d at 920 (referring to a *Caremark* claim as one alleging failure of board oversight).

[54] *In re Citigroup Inc. S'holder Derivative Litig.*, 964 A.2d 106, 123 (Del. Ch. 2009).

[55] *Id.* (citation omitted)

[56] *Stone*, 911 A.2d at 365-66, 370.

Teri and Mike used these asssets as justification for Broce acquiring Waldon even though Broce owned them in the first place. Asking whether the Broce board implemented a "reporting or information system or controls" in the context of these allegations does not make sense."[57] Thus, the *Caremark* test does not apply to Steve's claim, and the Court denies summary judgment.

   c. The Director Defendants' Business Decisions Unrelated to Waldon

    i. Proper and Adequate Accounting

  Alan, Mike, and Teri argue that they are entitled to summary judgment on Steve's claim that they breached their duty of care by committing waste related to Broce's accounting. Under Kansas law, a "director of a corporation is not charged with knowledge of what the officers in charge of the company are doing."[58] Director Defendants argue that Broce's accounting procedures were the province of its Chief Financial Officer and not Director Defendants. Accordingly, they argue they are not liable for any alleged waste related to Broce's accounting.

  In response, Steve concedes that Teri and Mike are not liable for this alleged conduct because they were not officers of Broce. Steve argues, however, that his claim against Alan should still proceed because Alan is an officer of Broce, and Director Defendants have not come forward with any other argument as to why it should not proceed. Director Defendants, however, also argue that summary judgment is warranted because Steve has no evidence that Alan was negligent in overseeing Broce's accounting. The Court agrees that Steve has not produced any evidence

---

[57] *Id*. at 370.

[58] *Harman v. Wilbern*, 520 F.2d 1333, 1335 (10th Cir. 1975) (citation omitted).

creating a genuine issue of material fact as to whether Alan negligently oversaw Broce's accounting.  Therefore, the Court grants summary judgment on this claim.[59]

ii.     Alan's and Teri's Compensation

Director Defendants next seek summary judgment on Steve's claims that Alan and Teri were over-compensated.  According to Director Defendants, Alan's and Teri's salaries do not amount to a breach of their fiduciary duties because (1) they were approved by disinterested and independent directors; (2) Alan's salary falls squarely within the reasonable range of CEO's salaries of similar companies in similar situations; and (3) even though Teri's salary may be high, her father set her initial salary and she has only received cost of living increases since it was set.

Salary determinations normally fall within directors' business judgment, "unless the facts show that such amounts, compared with the services to be received in exchanged, constitute waste or could not otherwise be the product of a valid exercise of business judgment."[60]  Here, Steve has met his burden to show a genuine issue of material fact regarding whether Alan's and Teri's compensation constituted waste.  Alan admitted that between 2012 and 2019, he spent fifty percent of his professional time advancing Broce's interests and fifty percent advancing Waldon's interests

---

[59] Steve argues throughout his brief that Director Defendants are erroneously seeking summary judgment on single factual allegations supporting his breach of fiduciary duty claim when they should seek summary judgment on Steve's entire breach of fiduciary duty claims.  For example, Steve argues that Director Defendants cannot seek summary judgment on Steve's claim that they breached their fiduciary duties by failing to ensure proper and adequate accounting at Broce.  The Court, however, does not agree.  The cases Steve relies upon in support of this argument are inapposite.  *See Cardenas v. Kanco Hay, LLC*, 2016 WL 3881345, at *6-7 (denying summary judgment where the plaintiff did not seek judgment as to liability but asked the court to rule that there is sufficient evidence to submit the plaintiff's negligence claims to the jury); *U.S. Fire Ins. Co. v. Bunge N. Am., Inc*., 2008 WL 3077074, at *18-*19 (D. Kan. 2008) (denying summary judgment where the movant asserted the non-movant "lack[ed] a sufficient factual basis for a particular defense," even though the movant had the burden of proof).

[60] *Grimes v. Donald*, 673 A.2d 1207, 1215 (Del. 1996), overruled in part on other grounds by *Brehm v. Eisner*, 746 A.2d 244 (Del. 2000); *Herald Co. v. Seawell*, 472 F.2d 1081, 1100 (10th Cir. 1972) (applying Colorado law) (citations omitted).

-32-

even though Broce paid 100 percent of his salary and his expenses.  Additionally, while serving as CEO, Alan lived in Boston, Massachusetts, over 1,000 miles away from Broce's primary location in Dodge City, Kansas.  As for Teri's salary, Steve's expert has opined that Teri was grossly overcompensated, and Director Defendants' own expert has also opined that she was over-paid by approximately $500,000.  This is sufficient evidence of waste for Steve's claims to survive summary judgment.

Furthermore, to the extent Director Defendants argue that Alan's and Teri's salaries were approved by disinterested and independent directors, the Court finds that there are genuine issues of material fact that preclude summary judgment on this basis as well.  As to Alan's salary, Steve has come forward with evidence from which a reasonable jury could believe Mike and Teri were not independent.[61]  And as to Teri's salary, there is no evidence of who approved her salary before 2018 (other than Bud who set her initial salary), and from 2018 to the present, there is a genuine issue of material fact as to whether Mike, her husband, was disinterested and independent.  Accordingly, the Court denies summary judgment as to this claim.

### iii.    Withholding of Distributions

In the Pretrial Order, Steve claims that Director Defendants breached their fiduciary duties by "reducing or eliminating shareholder distributions to oppress a shareholder."  Steve now asserts that he is not seeking monetary damages for unpaid distributions.  Therefore, the Court grants summary judgment in Director Defendants' favor on this claim.

---

[61] Based on the facts Director Defendants cite in their brief, Director Defendants appear to limit this argument to Alan's and Teri's salaries in 2018.  At that time, the Broce board consisted of Alan, Teri, and Mike.

3.      *Protection from Liability under K.S.A § 17-6301(e)*

Director Defendants argue that Alan, Teri, and Mike are fully protected under K.S.A. § 17-6301(e) because they relied on the advice of Broce's employees, including Steve, in making their decisions related to the Broce-Waldon transactions.  K.S.A. § 17-6301(e) provides:

> A member of the board of directors . . . shall, in the performance of such member's duties, be fully protected in relying in good faith upon the records of the corporation and upon such information, opinions, reports or statements presented to the corporation by any of the corporation's officers or employees . . . or by any other person as to matters the member reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the corporation.

Relying on Delaware law, which has an identical statute to K.S.A. § 17-6301(e), Director Defendants argue that this statute creates a "powerful defense" for directors who, in good faith, rely on the statements of the corporation's employees in performing the directors' duties.[62]

In response, Steve argues that the ability to rely on corporate employees does not supersede Director Defendants' burden to prove the Broce-Waldon transactions were entirely fair.  Quoting *Burcham, Unison Bancorp, Inc.*,[63] he argues that "the 'entire fairness' test is 'exacting' and requires 'judicial scrutiny' of both 'fair dealing and price.' "[64]   According to Steve, there is no basis in Kansas law in which evidence of Alan's and Teri's conversations with Broce's employees compels summary judgment on his breach of fiduciary duty claims.

*Burcham*, however, is inapplicable here.  While the Kansas Supreme Court does set forth the entire fairness test in that decision, it does so in the context of discussing how the business

---

[62] *See In re Del Monte Foods Co. S'holders Litig.*, 25 A.3d 813, 838 (Del. Ch. 2011) ("For directors who have relied on qualified advisors chosen with reasonable care, Section 141(e) provides another powerful defense.").

[63] 276 Kan. 393, 77 P.3d 130 (2003).

[64] *Id.* at 149 (quoting *Unitrin, Inc. v. Am. Gen. Corp.*, 651 A.2d 1351, 1371 n.7 (1995)).

judgment rule is applied in the context of defensive actions by the board, such as when a board adopts a poison pill in response to a perceived takeover bid.[65]  The *Burcham* court does not discuss K.S.A. § 17-6301(e) anywhere in its opinion.

Kansas case law discussing K.S.A. § 17-6301(e) is sparse and does not address whether the statute is a complete defense to liability.  The Delaware courts treat an identical Delaware statute, Del. Code Ann. § 144(e), as an affirmative defense.[66]  Because Kansas follows Delaware law on corporate matters, the Court concludes that K.S.A. § 17-6301(e) is a complete defense to a claim for breach of fiduciary duty.[67]  Therefore, if Director Defendants can show that there are no disputed material facts as to the requirements of K.S.A. § 17-6301(e), they are entitled to summary judgment on Steve's breach of fiduciary duty claims.

### a. The Broce-Waldon Transactions from 2012-2019

Director Defendants identify six instances in which Alan, Teri, or Mike allegedly relied upon the advice of a Broce employee as to the Broce-Waldon transactions from 2012-2019.[68] Director Defendants, however, have failed to tie these instances to the claims listed in the Pretrial Order, making it difficult for the Court to determine which claims Director Defendants are seeking summary judgment on as to this defense.  For example, Director Defendants assert that (1) Broce's

---

[65] *Id*. at 147-150.

[66] *See In re Orchard Enters., Inc. Stockholder Litig*., 88 A.3d 1, 48 (Del. Ch. 2014) (referring to § 141(e) of as an affirmative defense); *Ogus v. SportTechie, Inc*., 2020 WL 502996, at *14 (Del. Ch. 2020) (stating that § 141(e) "can protect directors of Delaware corporations from liability if the directors reasonably rely in good faith on the opinion of expert advisors" and is an affirmative defense).

[67] *See Kan. Heart Hosp*., 184 P.3d at 878 ("Reliance on a Delaware decision is consistent with our long history of looking to Delaware for guidance when applying the Kansas General Corporation Code, which was modeled on the Delaware Code.").

[68] Although Director Defendants argue that Mike is protected by K.S.A. § 17-6301(e) they do not identify any instances in which he relied on Broce employees in making decisions related to Waldon.  Therefore, the Court denies summary judgment as to Steve's breach of fiduciary duty claim against Mike on this basis.

engineering team told Alan that they couldn't take the cost out of the BB250; (2) Broce's sales team told Alan that Broce should have two-separate three-wheel sweepers and that cheapening the BB250 would not suffice and (3) after Waldon successfully designed the BW260, Broce's production team told Alan that Broce did not have the capacity to build the BW260.  These three instances are not specific breaches listed in the Pretrial Order.  Arguably, as a whole, these three instances relate to Steve's claim that Alan breached his duty of care "by allowing Broce's corporate assets and opportunities to flow to Waldon while failing to capitalize on Broce's ability to manufacture and sell a less expensive . . . BB250."  But this claim encompasses more than Alan's decision to design a new three-wheel sweeper and for Waldon to manufacture it.  Steve also alleges that Broce could have designed the BW260 itself—through the third-party engineer that Waldon hired.  Thus, even if K.S.A. § 17-6301(e) is satisfied in these three instances, the Court cannot grant summary judgment.[69]

As to the remaining three instances identified by Director Defendants, the Court concludes that there are genuine issues of material fact as to whether Alan and Teri relied on Broce employees' statements or whether such reliance was in good faith.  Director Defendants assert that Alan decided to have Broce sell Waldon's products because Broce's sales team told him they could make money doing it.  According to Director Defendants, Alan and Teri discussed the plan with Steve, and Steve did not object.  In response, Steve presents evidence that even if Alan initially

---

[69] The facts as to the design and manufacture of the BW260 are heavily disputed.  In the alternative, the Court notes that it cannot grant summary judgment as to this claim because there is a genuine issue of material fact as to whether Alan relied on Broce's engineering team in good faith when they told him they could not reduce the cost of the BB250.  Steve has come forward with evidence that Alan had a list of ways to reduce the cost of producing the BB250 but never shared it with Alan, Teri, or Broce's operations team.  There is also a genuine issue of material fact as to whether the sales team told Alan that Broce needed a new three-wheel sweeper instead of the modified BB250.  Steve has presented evidence that the sales team did not oppose the idea of a lower cost BB250.

relied on the statements of Broce's employees in 2012, Alan continued to require Broce employees to sell Waldon's products in 2014, despite not knowing whether the arrangement was beneficial to Broce.  Furthermore, the Court disagrees with Director Defendant that K.S.A. § 17-6301(e) is satisfied simply on the basis that Steve did not object to the Broce-Waldon sales arrangement.  To obtain protection under K.S.A. § 17-6301(e), the director must rely on the opinions or statements of an employee.  Director Defendants do not point to any evidence that Steve advised Alan and Teri that the sales arrangement would be beneficial to Broce.  They only assert that he never objected to it in their discussions.  Therefore, the Court cannot conclude that Director Defendants have met the requirements of K.S.A. § 17-6301(e) in this instance.

Next, Director Defendants assert that Broce's sales team told Alan that they faced a production backlog that risked sales.  According to Director Defendants, Teri asked whether Waldon could produce the BB250 to eliminate the backlog, and after consulting Steve and other Broce employees, Alan and Teri decided to have Waldon produce a limited number of BB250s.

The Court agrees that it is uncontroverted that Alan, Teri, and Steve discussed the backlog issues as a group.  However, there is no evidence showing that Alan and Teri relied on Broce's employees in deciding that Waldon should produce the BB250s to relieve the capacity issues at Broce.  Steve also has come forward with evidence showing that the plan for Waldon to produce the BB250 was not to address a current capacity need at Broce but to allow Waldon to "tool up" to address future capacity needs, if any.  Therefore, there is a genuine issue of material fact as to whether Alan and Teri relied on Broce's employees in good faith in deciding to have Waldon manufacture the BB250.

Finally, Director Defendants assert that with respect to the design and manufacture of the FMJ470, the front-mounted broom, Broce's engineering team told Alan that Broce could not

design it.  Defendants also assert that Alan disclosed to Steve that Waldon was going to design and manufacture the broom for Broce, and Steve did not object.  Steve, however, has come forward with evidence disputing whether Broce's engineering staff informed Alan that Broce could not build the front-mounted broom.  Although Defendants rely on the testimony of Broce engineer Mark Chalfant, he testified that he was not involved in any discussions with Alan regarding the design or manufacture of the FMJ470.  Defendants also rely on the testimony of Matt McNamara, who stated that he preferred the manufacturing of the FJM470 not be completed in Dodge City, not that it was impossible.  Thus, Director Defendants have not met their burden in this instance as well.

Overall, the Court Concludes that Director Defendants have not met their burden to show they are protected from liability under K.S.A. § 17-6301(e) as to the Broce-Waldon transactions from 2012 to 2019.

b.      The Broce-Waldon Acquisition

Director Defendants argue that they are protected from liability as to the Broce-Waldon acquisition under K.S.A. § 17-6301(e) because they relied on BKD for the valuation of Waldon's assets.  According to Steve, this argument misses the mark because his claim encompasses more than the assertion that Broce paid too much for Waldon.  Steve argues that because Director Defendants do not identify an independent expert that told them to buy Waldon, they are not fully protected under K.S.A. § 17-6301(e).

The Court agrees with Steve.  The BKD valuation only addresses the value of Waldon's assets.  It does not contain an independent assessment of whether acquiring such assets would be beneficial for Broce.  Although Steve claims that Broce paid too much for Waldon, Steve's breach of fiduciary duty claim as to the Broce-Waldon acquisition alleges more.  He asserts that Broce

never needed to acquire Waldon's assets in the first place. Therefore, the Court cannot grant summary judgment on this basis.

### 4.    *Equitable Estoppel*

Director Defendants next argue that equitable estoppel bars Steve's claims as to Broce's transactions with Waldon. According to Director Defendants, Steve agreed to each of the transactions, and thus it would be unconscionable to allow Steve to now take positions inconsistent with the ones he previously acquiesced. Specifically, Director Defendants assert that Steve knew all along that (1) Alan bought Waldon in 2012 but Steve did not object; (2) Broce's sales team sold Waldon's products between 2012 and 2014, and Steve participated in this decision as strategic advisor; (3) Waldon was building the BB250 for Broce in 2015, and Steve participated in the decision; (4) Broce had Waldon design the BW260, and Steve did not object; (5) Waldon was producing the BW260 for Broce, and Steve did not object; and (6) Waldon was designing Broce's front-mounted broom for Broce, and Steve did not object.

In Kansas, application of the equitable estoppel doctrine rests within the sound discretion of the trial court.[70]

> Equitable estoppel is the effect of the voluntary conduct of a person whereby he is precluded, both at law and in equity, from asserting rights against another person relying on such conduct. A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed. It must also show it rightfully relied and acted upon such belief and would now be prejudiced if the other party were permitted to deny the existence of such facts.[71]

---

[70] *Bankers Tr. Co. v. United States*, 29 Kan. App. 2d 215, 25 P.3d 877, 880 (2001) (citation omitted).

[71] *Turon State Bank v. Bozarth*, 235 Kan. 786, 684 P.2d 419,422 (1984) (quoting *Levi Strauss & Co. v. Sheaffer*, 8 Kan. App. 2d 117, 650 P.2d 738, 743 (1982)).

Equitable estoppel usually involves questions of fact, and when the facts are disputed, summary judgment must be denied.[72]

Director Defendants rely on *Schraft v. Leis*[73] in arguing that estoppel bars Steve's claims. Schraft was a 50 percent shareholder of a small business.[74]  He sued Leis, the other 50 percent shareholder, for receiving unauthorized salary and profit-sharing benefits among other allegations.[75]  Schraft had previously signed two sets of corporate minutes—one establishing the profit-sharing plan and another terminating the profit-sharing plan.[76]  He brought suit several years later claiming that the payments to Leis "constituted a breach of fiduciary duty because they were done without his knowledge."[77]   Among other doctrines, the trial court held that estoppel barred Schraft's profit-sharing claim, and the Kansas Supreme Court affirmed.  The court reasoned that Schraft "had actual knowledge of the plan several years before filing this action but failed to complain of it at the time," and the record lacked any evidence "that payments made under the plan were concealed from the plaintiff or that he inquired about the plan after signing the minutes."[78]

This case is distinguishable from *Schraft* in that Steve has come forward with evidence demonstrating that he did not have full knowledge of almost all the Broce-Waldon transactions

---

[72] *Dunn v. Dunn*, 47 Kan. App. 2d 619, 281 P.3d 540, 554 (2012) (citations omitted).

[73] 236 Kan. 28, 686 P.2d 865 (1984).

[74] 686 P.2d at 869.

[75] *Id*.

[76] *Id*. at 874.

[77] *Id*.

[78] *Id*.

cited by Defendants from 2012-2017.  With regard to Broce salesmen selling Waldon's products, Steve has come forward with evidence that neither Alan nor Teri informed him that Broce salesman would be devoting 20 percent of their professional time per month to advancing Waldon's products or that one Broce salesman was required to spend 100 percent of his time advancing Waldon's products while Broce paid his full salary and benefit.  Furthermore, Steve has produced evidence showing that he requested information from Alan as to whether the Broce-Waldon sales arrangement was profitable for Broce and never received it.  With regard to Waldon manufacturing the BB250, Steve has come forward with evidence showing that Alan falsely informed him that moving the BB250 to Waldon was needed to open up space, when it was not. As to Waldon designing and building the BW260, Steve has come forward with evidence that (1) Alan failed to disclose in 2015 that he had a list of ways to reduce the manufacturing cost of the BB250 instead of designing the BW260; (2) Alan failed to tell him that he and Waldon hired an outside designer, Ricky Heflin, to design the BW260; (3) Alan informed him after the fact that Waldon owned the BW260; and (4) Alan did not inform him that Waldon would own the back-end parts business for the BW260.  Unlike the plaintiff in *Schraft*, Steve's participation in and acquiescence to these transactions was not fully informed.  Thus, there is a genuine issue of material fact as to whether Steve's failure to object to them at the time equitably estops him from bringing his current claims.

However, the Court agrees with Director Defendants with respect to Steve's claim that Alan breached his fiduciary duties of care and loyalty by "engaging Waldon, an inefficient manufacturing company, to design and build Broce's front-mounted broom."  First, the Court notes that Steve does not address Director Defendants' estoppel defense as to this claim in his response to Director Defendants' motion.  More importantly, however, the undisputed facts show that Steve

did not object to Waldon designing and building the front-mounted broom on the basis that Waldon was an "inefficient manufacturing company."  In January 2018, Alan emailed Steve and told him that Waldon was designing a front-mounted broom (the FMJ470) and he intended "to operate under a similar arrangement" as the BW260 when that product was ready to take to market.  In that same email, Alan informed Steve that Waldon, and not Broce, owned the design of the BW260.  In response to Alan's email, Steve objected to Waldon's ownership of the BW260 and a new front-mounted broom.  He did not object, however, to Waldon designing the broom on the basis that Waldon was incompetent or it was unprofitable for Broce to do so.  Because Steve was aware Waldon was designing and building the front-mounted broom and failed to raise Waldon's inefficiencies as a reason for Waldon to stop, Steve should be estopped from now asserting that Alan breached his fiduciary duties on this basis.  Accordingly, the Court grants summary judgment on Steve's claim that Alan breached his fiduciary duties because he hired Waldon to design and build Broce's front-mounted broom. The Court denies summary judgment as to Steve's other claims based on Director Defendants' estoppel defense.

### 5.    *Unclean Hands*

Director Defendants next assert that Steve's unclean hands prevent him from complaining that Broce should have made capital improvements to its facility.  "The clean hands doctrine in substance provides that no person can obtain affirmative relief in equity with respect to a transaction in which he has, himself, been guilty of inequitable conduct."[79]  Defendants argue that Steve is barred by unclean hands because the dispute he raised over land ownership at the Broce facility in the trust case must be resolved before Broce can do anything about expanding its own

---

[79] *Green v. Higgins*, 217 Kan. 217, 535 P.2d 446, 449 (1975).

facility.  In response, Steve argues that he is not complaining that Broce needed to expand.  He asserts that no expansion was needed.  Instead, he asserts that Alan "used the alleged 'capacity restraints' at Broce to falsely justify his self-dealing, culminating in Broce buying Waldon and its aged facility in Fairview, Oklahoma."  Because Steve is not asserting that Broce should have expanded its facility, the Court denies summary judgment as to Director Defendants' unclean hands argument.

### 6.      Steve's Stock Ownership Claim

Steve asserts breach of fiduciary duty claims against Teri, Alan, and Mike for allegedly reducing the percentage of stock Steve owned in Broce.  Steve asserts this claim individually, not as a derivative plaintiff.  Steve claims that after the stock redemption and distribution of shares in 2008, he was to own 311.38 shares, or 30.39 percent, of Broce.  Steve further claims that during discovery in this case, he learned that Teri instituted an additional gift of shares from Deloris to Mike and Julie without telling Steve.  According to Steve, Mike and Julie should each own 45 shares of Broce stock instead of each owning 71.97 shares.  Steve asserts that this undisclosed gift resulted in Mike's and Julie's ownership interest increasing by hundreds of thousands of dollars while at the same time decreasing his ownership interest.

 Director Defendants argue that Steve cannot recover on this claim because it is time-barred.  The statute of limitations for a breach of fiduciary duty claim is two years.[80]  According to Director Defendants, Steve had notice of a potential discrepancy in his stock ownership in 2009, and his distributions at that time reflected his alleged injury.  But, Steve did not assert his stock-

---

[80] *See* K.S.A. § 60-513(a)(2) (stating that a two-year statute of limitations applies to claims for injury or recovery of personal property); *see also Mid-Continent Anethesiology Chartered v. Bassell*, 61 Kan. App. 2d 411, 504 P.3d 1069, 1079 (2021) (stating that a two-year statute of limitations applied to the plaintiff's claims for breach of fiduciary duty).

ownership claim until he filed this lawsuit in 2019, ten years later. Thus, Director Defendants argue that the statute of limitations bars Steve's claim. In response, Steve argues that there is a dispute of material fact regarding when his injury was reasonably ascertainable, and thus, his claim is timely.

A breach of fiduciary duty claim is subject to the discovery rule, which provides that "if the fact of injury is not reasonably ascertainable until some time after the initial act, then the period of limitation shall not commence until the fact of injury becomes reasonably ascertainable to the third party."[81] Here, Steve asserts in his declaration that he did not, and could not, know about the change in stock ownership until an outside accountant audited Broce in 2018. Thus, he argues his claim is not time-barred because he filed his initial complaint less than two years from that date.

The Court disagrees. Steve's injury was reasonably ascertainable in 2009 or 2010. It is undisputed that in October 2009, Teri sent Steve a chart reflecting Broce's stock ownership, and that chart reflected that Mike and Julie each owned 71.97 shares. It is also undisputed that in December 2009, Teri sent Steve a stock ownership schedule that reflected Mike and Julie each owned 45 shares. Although Steve claims that he could not have known until 2018 that Mike and Julie each owned 71.97 shares instead of 45 shares, these emails reflect the discrepancy in stock ownership such that Steve would have been able to reasonably ascertain there was an issue. Additionally, Steve's K-1 always showed his ownership percentage, and he admits he saw his K-1 every year. Steve testified that his ownership percentage changed in the K-1s but it never showed the percentage he now claims. If Steve had examined his K-1 percentage more closely, especially in light of the discrepancies between the October and December 2009 emails, his injury would

---

[81] K.S.A. § 60-513(b); *LCL, LLC v. Falen*, 53 Kan App. 2d 651, 390 P.3d 571, 577 (2017).

have been reasonably ascertainable long before 2018.  Therefore, the Court grants summary judgment in Director Defendants' favor on Steve's stock ownership claim.[82]

### 7.    *Unjust Enrichment*

Steve asserts an unjust enrichment claim against Alan, Julie, and Teri.  He alleges that Alan and Julie were unjustly enriched through their ownership of Waldon when they engaged in self-dealing transactions between Waldon and Broce.  He also alleges that Alan was unjustly enriched due to his overcompensation and the fact that he spent 50 percent of his time advancing Waldon's interest but Broce paid 100 percent of his salary.  As to Teri, Steve alleges that she was unjustly enriched due to her overcompensation and accepting corporate funds for non-corporate efforts.

Director Defendants assert three reasons as to why they are entitled to summary judgment on Steve's unjust enrichment claims.  First, they argue that because the facts underlying Steve's fiduciary duty claims are the same as those underlying his unjust enrichment claims, the claims rise and fall together.  Second, they argue that even if the unjust enrichment claims do not fall with the fiduciary duty claims, summary judgment is warranted because Steve is only allowed one recovery under the same facts and elements of proof.  And third, they argue that summary judgment is independently warranted because Alan's and Teri's compensation and Broce's agreements with Waldon were contractual.

As to Director Defendants' first argument, Steve effectively agrees the unjust enrichment claims rise and fall with the breach of fiduciary duty claims.[83]  The Court has granted summary

---

[82] Because the Court concludes that Steve's stock ownership claim is barred by the statute of limitations, the Court does not consider Director Defendants' arguments that the claim is also barred by K.S.A. § 60-513(b)'s statute of repose or that it fails on its merits.

[83] *E.g., Frank v. Elgamal*, 2014 WL 957550, at *31 (Del. Ch. 2014) ("[I]f the Court dismisses a fiduciary duty claim for failure to state a claim, then it very likely also dismisses a duplicative unjust enrichment claim.

judgment on Steve's breach of fiduciary duty claims as to Director Defendants' alleged failure to ensure proper and adequate accounting, the decision not to make a shareholder distribution, the decision for Waldon to design and manufacture the front-mounted broom, and the alleged reduction of Steve's shareholder percentage. To the extent Steve seeks to recover based on unjust enrichment as to these allegations, the Court grants summary judgment on Steve's claim.

As to Director Defendants' second argument, Steve concedes that he is precluded from duplicative recoveries on his breach of fiduciary duty and unjust enrichment claims. He argues, however, that Director Defendants offer no authority suggesting he is required to elect between alternative theories of recovery at summary judgment. Steve asserts that any threat of double recovery can be addressed in the jury instructions at trial.

The Court agrees with Steve. This Court has held that under Kansas law, while a plaintiff is not allowed to make a duplicative recovery for the same injuries, he is allowed to submit claims as alternative theories of recovery at this stage in the litigation.[84] Steve is allowed to submit his breach of fiduciary duty and unjust enrichment claims, although he may not recover on both at trial.

Director Defendants' final argument is that Steve's unjust enrichment claims are barred because contracts govern Broce's transactions with Waldon and Alan's and Teri's compensation. "Unjust enrichment falls under the category of quantum meruit and restitution, and these are not

---

Conversely, where the court does not dismiss a breach of fiduciary duty claim, it likely does not dismiss a duplicative unjust enrichment claim.").

[84] *See BHC Dev., L.C. v. Bally Gaming, Inc.*, 2014 WL 781871, at *2 (D. Kan. 2014).

available theories of recovery when a valid, written contract addressing the issue exists."[85]  Put another way, "Kansas does not allow an unjust enrichment claim where contractual remedies are available."[86]    The Court rejects Director Defendants' argument as to the Broce-Waldon transactions.  Here, the contracts were between Broce and Waldon, yet Steve asserts an unjust enrichment claim against Alan and Julie.  Because Broce does not have a contractual remedy against Alan and Julie, the Court denies summary judgment.

As to Alan's and Teri's compensation, however, unjust enrichment is not an appropriate claim.  Steve does not assert that Alan's and Teri's compensation contracts with Broce are void or unenforceable.  Therefore, Broce's right to recover against Alan and Teri run through those contracts, not through a quasi-contractual remedy.  "[A] party may not bring a claim for unjust enrichment on a matter covered by an agreement.  As such, whether the matter is covered by a written or oral contract does not change the fact that summary judgment on this claim is appropriate where a contract exists."[87]  Accordingly, the Court grants summary judgment on Steve's claim for unjust enrichment as to Alan's and Teri's compensation.

### 8.    Punitive Damages

Defendants seek summary judgment on Steve's claim for punitive damages.  Punitive damages are "given as an enhancement of compensatory damages because of the wanton, reckless, malicious, or oppressive character of the acts complained of.  Such damages go beyond the compensatory damages suffered in the case; they are allowed as a punishment of the defendant

---

[85] *Swimwear Sol., Inc. v. Orlando Bathing Suit, LLC*, 309 F. Supp. 3d 1022, 1037 (D. Kan. 2018) (internal quotation marks and citation omitted).

[86] *Id*. at 1039 (citation omitted).

[87] *Jayhawk 910 VP, LLC v. WindAirWest, LLC*, 2020 WL 3270540, at *4 (D. Kan. 2020).

and as a deterrent to others. . . ."[88]   Director Defendants argue that they have not engaged in "wanton, reckless, malicious, or oppressive conduct" but instead have increased Broce's profits by millions of dollars since 2004.   Steve, however, has come forward with expert evidence disputing Broce's allegations of performance due to Alan's alleged self-dealings.   Steve has also come forward with evidence from which a rational jury could find that Alan engaged in massive self-dealing, intentionally failed to disclose material facts, and entered into a Manufacturing Agreement that he and the other Director Defendants never intended to enforce.   Therefore, the Court finds that there is a genuine issue of material fact as to whether Director Defendants' conduct was "wanton, malicious, or oppressive," and denies Director Defendants' motion for summary judgment on this basis.

*9.     Conclusion*

The Court grants Director Defendants' motion for summary judgment as to Steve's claims that Alan, Teri, and Mike breached their fiduciary duties by failing to ensure proper and adequate accounting at Broce, by withholding shareholder distributions, by improperly reducing Steve's shareholder percentage, and by engaging Waldon to design and build Broce's front-mounted broom.   The Court also grants summary judgment as to any claim for unjust enrichment Steve asserts based on these allegations and any claim for unjust enrichment as to Teri's and Steve's compensation.   Because there are genuine issues of material fact as to whether Director Defendants are entitled to judgment as a matter of law on Steve's remaining claims, the Court denies Steve's Motion for Summary Judgment as to them.

---

[88] *Newton*, 582 P.2d at 1150 (quoting 22 Am. Jur. 2d Damages, § 236 (1965)).

**B.      Waldon's Motion for Summary Judgment (Doc. 196)**

Steve's sole claim against Waldon is unjust enrichment.  Steve asserts the Waldon was unjustly enriched at the expense of Broce through (1) excess profits to Waldon from the sale of the BW260 and the sale of Waldon to Broce; (2) avoided salaries and costs from Broce to Waldon; and (3) sales and name commissions at an unfair amount.  Waldon seeks summary judgment on Steve's claim on the following bases:  (1) a contract governs the parties' rights as to the Broce-Waldon acquisition; (2) Steve's claim is barred by the statute of limitations; and (3) Steve's claim is barred by estoppel.[89]

*1.      Unjust enrichment and contract principles*

Under Kansas law, a claim for unjust enrichment is not available when there is an adequate remedy at law.[90]  Steve asserts that Broce's acquisition of Waldon's assets and liabilities was unfair to Broce because Broce overpaid for Waldon's facility and other assets.  This aspect of Steve's claim, however, is addressed by the Asset Purchase Agreement between Broce and Waldon.  If Steve believes that Broce did not get the type, value, or quality of assets it bargained for in the Asset Purchase Agreement, then Broce can bring a breach of contract claim against Waldon.  In other words, a claim by Broce relating to the Asset Purchase Agreement is a claim sounding in contract, not equity.  Therefore, Steve's unjust enrichment claim as it relates to the purchase of Waldon's assets by Broce fails as a matter of law.

---

[89] Waldon also argues that Steve is not a suitable plaintiff under Rule 23.1, adopting Director Defendants' arguments on this issue to the extent they are applicable to Waldon.  Based on the same reasoning set forth earlier in this Order, the Court denies Waldon's motion on this basis.

[90] *Deeds v. Waddell & Reed Inv. Mgmt. Co.*, 47 Kan. App. 2d 499, 280 P.3d 786, 795 (2012) (citation omitted).

2.       *Statute of Limitations*

Waldon argues that Steve's claims for unjust enrichment as to (1) avoided salaries and costs from Broce to Waldon and (2) sales and name commissions at unfair amounts are time-barred.  An unjust enrichment claim is subject to a three-year statute of limitations for implied contracts.[91]  Steve filed his original Complaint in this case on May 22, 2019.  Waldon argues that the undisputed facts show that Steve's claim accrued at the latest in 2014 when Broce employees sold Waldon's products.  Waldon further argues that the discovery rule does not apply to unjust enrichment claims.  Thus, Waldon asserts that Steve's claim is time-barred because the claim accrued more than three years before the Complaint was filed.

It is unsettled in Kansas whether the discovery rule applies to an unjust enrichment claim, and in previous cases, this Court has declined to apply the discovery rule to such claims.[92]  Steve argues, however, that the application of the discovery rule is irrelevant in this case because Waldon should be equitably estopped from asserting that his claim is untimely.  According to Steve, Waldon, through its principals, possessed material information that was purposefully hidden from Broce and Steve, and Waldon should not be allowed to escape liability based on this deception.

"A party asserting equitable estoppel must show that another party, by its acts, representations, admissions, or silence when it had a duty to speak, induced it to believe certain facts existed."[93]  Additionally, the party must show it "relied and acted upon such belief and would

---

[91] K.S.A. § 60-512; *see Hartman v. Stumbo*, 195 Kan. 634, 408 P.2d 693, 696 (1965); *Doll v. Chicago Title Ins. Co.*, 517 F. Supp. 2d 1273, 1281 (D. Kan. 2007).

[92] *See N. Nat. Gas Co. v. L.D. Drilling, Inc.*, 405 F. Supp. 3d 981, 1017 (D. Kan. 2019) (citing *Freebird, Inc. v. Merit Energy*, 883 F. Supp. 2d 1026 (D. Kan. 2012); *Doll*, 517 F. Supp. 2d at 1281-82).

[93] *Rockers v. Kan. Turnpike Auth.*, 268 Kan. 110, 991 P.2d 889, 894 (Kan. 1999) (quoting *United Am. State Bank & Trust Co. v. Wild West Chrysler Plymouth, Inc.*, 561 P.2d 792, 795 (1977).

now be prejudiced if the other party were permitted the deny the existence of such facts."[94]

Equitable estoppel can be applied to bar a party from relying on a statute of limitations defense.[95]

As the Kansas Supreme Court has stated, the "mere fact of remaining silent, when possessing material knowledge not held by another is sufficient to toll the statute where that silence causes another to fail to take timely action which he would have taken had he possessed such knowledge."[96]  However, the party seeking to toll the statute of limitations must "explain why due diligence did not lead or could not have led to the discovery of the facts and cause of action."[97]

Accordingly, "to survive summary judgment, [a] plaintiff must raise a genuine issue of material fact with respect to whether the exercise of reasonable diligence could have led it to discover the claims at issue."[98]

In response to Waldon's motion, Steve offers evidence that Alan, who was Waldon's principal, never told him that Broce employees would be devoting 20 percent of their time to selling Waldon's products and one Broce employee worked full time for Waldon, yet Broce paid all wages, benefits, and expenses for that employee.  Additionally, Steve also offers evidence that Alan told him the commission Waldon was paying Broce was appropriate, but it was not.  As to whether Steve has produced evidence regarding whether due diligence led him to discover the facts giving rise to his claim, Waldon points out in its reply brief that Steve testified in his

---

[94] *Id*.

[95] *Id*.

[96] *Freebird, Inc. v. Merit Energy Co*., 883 F. Supp. 2d 1026, 1036 (D. Kan. 2012) (quoting *Baker v. Bd. of Regents*, 991 F.2d 628, 633 (1993)) (internal quotation marks omitted).

[97] *Id*. at 1037 (citations omitted).

[98] *Id*.

deposition that he believes he objected to the Waldon-Broce sales arrangement.  Waldon also points out that Steve requested information from Alan regarding whether the commission Broce was receiving from Waldon was favorable, but Steve never received this information.  Although Waldon argues that this evidence shows Steve was aware of his potential claim from 2012 to 2014, the Court disagrees.  When the facts are read in the light most favorable to Steve, this evidence suggests that Steve performed his due diligence as to his claim but could not discover it because Alan never provided the requested information.  This evidence is sufficient to create a genuine issue of material fact as to Steve's due diligence.  Therefore, the Court denies summary judgment on this basis.

> 3.      *Estoppel*

Waldon next argues that Steve is estopped from pursuing claims for unjust enrichment against Waldon because he "was armed with information and knowledge of the decisions at issue in this matter."  Waldon argues that Steve knew the sales arrangement between Broce and Waldon, knew the commission structure, and never once complained or objected.  Waldon thus argues that Steve should be estopped from asserting his claim when he knew what was occurring years ago and failed to object at that time.

The Court is not persuaded by Waldon's argument.  As discussed above, Steve has produced evidence showing that he requested information from Alan regarding whether the commission arrangement between Broce and Waldon was profitable, and he never received it.  Furthermore, Steve has produced evidence showing that while he may have been aware of the commission structure between Broce and Waldon, he was not fully aware of the sales arrangement.  This evidence creates a genuine issue of material fact as to whether Steve should be estopped from bringing his unjust enrichment claim.

*4.      Conclusion*

Steve's claim for unjust enrichment is barred to the extent he seeks the alleged excess profits Waldon received from the sale of Waldon's assets and liabilities to Broce.  Therefore, the Court grants summary judgment as to this aspect of Steve's claim.  To the extent Steve's unjust enrichment claim seeks (1) avoided salaries and costs from Broce to Waldon; and (2) sales and name commissions at an unfair amount, the Court denies summary judgment.  Steve has come forward with evidence creating a genuine issue of material fact as to whether the statute of limitations and estoppel bars his claim.

**IT IS THEREFORE ORDERED** that Director Defendant's Motion for Summary Judgment (Doc. 193) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS FURTHER ORDERED** that Waldon's Motion for Summary Judgment (Doc. 196) is **GRANTED IN PART AND DENIED IN PART**.

**IT IS SO ORDERED**.

Dated this 12th day of September, 2023.

ERIC F. MELGREN
CHIEF UNITED STATES DISTRICT JUDGE